**FEDERAL DEPOSIT INSURANCE CORPORATION, in its separate corporate capacity, Plaintiff,**

v.

**Mike R. ALLEN, et al., Defendants.**

No. Civ. 1–83–422.

United States District Court,
E.D. Tennessee, S.D.

April 17, 1984.

James R. Buckner and Douglas T. Johnson, Miller & Martin, Chattanooga, Tenn., for plaintiff.

Jess Campbell, Banks & Campbell, Knoxville, Tenn., for Valley Machinery Rental and Mike R. Allen.

Paul Jennings, Waddey & Newport, Nashville, Tenn., for Valley Machinery Corporation.

Richard P. Jahn, Sr., Tanner, Jahn, Atchley, Bridges & Jahn, Chattanooga, Tenn., and Frank B. Bird, Bird, Navratil & Bird, Maryville, Tenn., for Hal Y. Roe.

## MEMORANDUM

MILBURN, District Judge.

This action came on for trial on April 11, 1984, without the intervention of a jury. When the case was called, it was announced to the Court that counsel for the corporate defendants had agreed that a consent judgment could be entered against defendants Valley Machinery Rental & Leasing, Inc., and Valley Machinery Corporation.

The trial continued on April 12, 1984, and at the end of all proof the Court heard argument of counsel and then took this matter under advisement. After considering the testimony of the witnesses, the exhibits filed in the record, argument of counsel and the entire record herein, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. The present action was instituted by the United American Bank in Hamilton County ("UAB–C") upon May 13, 1983, to recover upon a note in the principal amount of $404,000 executed in its favor upon September 16, 1982, as follows:

Valley Rental & Leasing Co., Inc.

By: Mike R. Allen

2. On May 25, 1983, the Commissioner of Banking of the State of Tennessee assumed possession and control of UAB–C pursuant to T.C.A. § 45–2–1502. Subsequently on May 27, 1983, the Receivership for the UAB–C was tendered to the FDIC pursuant to T.C.A. § 45–2–802 which appointment was accepted. Thereafter, and as approved by the Chancery Court of Hamilton County, Tennessee, on May 27, 1983, the Receiver sold to the plaintiff certain notes including the note of Valley Rental & Leasing, Inc., described above.

3. Subsequently, the FDIC was substituted as the plaintiff in this action and removed the case to this Court upon August 16, 1983.

4. The now insolvent UAB–C was a state bank whose deposits were insured by the FDIC. From about July, 1981, until its insolvency, UAB–C was controlled by Jacob ("Jake") F. Butcher. Jake Butcher now resides in Sweetwater Oaks, Florida, which is just outside Orlando.

5. Jacob F. Butcher and his brother, C.H. Butcher, owned or controlled 27 banks in the States of Tennessee and Kentucky, including: United American Bank in Hamilton County, United American Bank in Knoxville, City & County Bank of Knox County, City & County Bank of Roane County, City & County Bank of Anderson County, City & County Bank of Washington County, City & County Bank of Union County, Bank of Commerce of Morristown, and United American Bank in Nashville.

6. On December 5, 1977, Bull Run Oil Company, Incorporated ("BRO–# 2") was incorporated under the laws of Tennessee. This was the second of three corporations to be so named. Subsequently, upon June 17, 1982, BRO–# 2 changed its name to Valley Management Corporation ("Valley Management"). The directors of BRO–# 2—Valley Management have included: Jacob F. Butcher, his wife, Sonya Butcher, and Jesse Barr.

Its officers have included Jacob F. Butcher—President, Jesse Barr—Vice President, and Sonya Butcher—Secretary.

From Jake Butcher's financial statements, BRO–# 2—Valley Management appears to have been primarily a holding company with an asset being General Equipment Company.

7. Jesse Barr worked as a management consultant with the firm of Management Associates which was owned by his wife. Management Associates was paid $2,000 per month by Valley Machinery for financial consulting. He is involved in numerous other dealings with Jake Butcher and was convicted around 1976 of embezzling over 30 million dollars from Union Planters Bank. Union Planters has an unsatisfied civil judgment against Barr in the amount of 17.6 million dollars. While at Union Planters, Barr loaned Jake Butcher approximately 5 million dollars for the acquisition of First and Farmers Bank ·at Somerset and City and County Bank of Lake City. In 1975 when Barr was fired by Union Planters, he was hired by Jake Butcher. As a convicted felon, Barr is prohibited from holding employment with an insured bank pursuant to 12 U.S.C. § 1818 and 12 C.F.R. § 308.58.

8. General Equipment Corporation ("GEC") was incorporated about March 10, 1972, under the laws of Tennessee by William C. Pendleton. GEC was at all relevant times the John Deere equipment dealer for the Knoxville, Tennessee area. As more fully described below, BRO–# 2 acquired all the stock of GEC on or about November 2, 1979 and subsequently amended the name of the corporation to Valley Machinery Corporation ("Valley Machinery").

9. Hal Y. Roe is a sophisticated forty-four year old who presently works as an insurance agent in Sevierville, Tennessee. While in school at the University of Tennessee in Knoxville, Roe was a fraternity brother of Jake Butcher. He obtained a B.S. Degree with a major in Business Administration from Tennessee Wesleyan College, Athens, Tennessee, formerly managed a jewelry store, and has as well served as a plant superintendent for a sand and gravel company. In 1976, Roe became dissatisfied with his job and contacted Jake Butcher. Butcher gave Roe a job in public relations at his flagship bank, United American Bank of Knoxville ("UAB–K"). Roe had no previous public relations experience. When Jake Butcher ran for governor of Tennessee in 1978, Roe also served as the Nashville office manager of his campaign. Then on November 2, 1979, at Roe's suggestion, Butcher decided to purchase the stock of GEC. Butcher caused BRO–# 2 to purchase the stock of GEC. Roe was named President and served as a director of GEC. The other director of GEC was Jake Butcher. Sonya Butcher served as Secretary/Treasurer. Ray Milton served as Controller. Milton had previously worked with David Crabtree's accounting firm. Crabtree served as C.H. Butcher's accountant and is presently under indictment for attempting to take 1.3 million dollars out of the country while in bankruptcy in violation of 18 U.S.C. § 152. Helen Kimbrough and Judy Franklin also served as Assistant Secretary and Treasurer and were Jake Butcher's secretaries in the UAB–K office building in Knoxville, Tennessee.

10. In order to acquire the premises occupied by GEC as a tenant, a limited partnership by the name of Pellissippi Parkway, Ltd., was formed on November 1, 1979, with Hal Y. Roe as general partner and 25% owner while William Shumate served as trustee for the 75% limited partner. This limited partner was Jake Butcher. William Shumate was a partner in the law firm of Ridenour, Ridenour, Ridenour, Bowers and Shumate. This firm also served as general counsel of UAB–K and apparently for BRO–# 2 and GEC as well.

11. On November 2, 1979, Hal Y. Roe signed a $1,000,000 note as the general partner of Pellissippi Parkway, Ltd. at the C & C Bank of Knox County for the stated purpose of purchasing real property ("Loan 1"). Also on November 2, 1979, Jacob F. Butcher as president of BRO–# 2 signed a

$500,000 note at the C & C Bank of Anderson County for the stated purpose of purchasing GEC stock ("Loan 2").

12. The $500,000 proceeds from Loan 2 was transferred to BRO-# 2's account at C & C Bank of Anderson County, thence to UAB-K and thence to BRO-# 2's account at C & C Bank of Knox County. Then also on November 2, 1979, BRO-# 2 issued its check in the amount of $400,000 payable to Hal Y. Roe and signed by Jake F. Butcher. BRO-# 2 also issued its check signed by Jake Butcher in the amount of $100,000 payable to GEC on November 2, 1979, apparently for working capital.

13. The $1,000,000 proceeds from Loan 1 were deposited in the account of Pellissippi Parkway, Ltd. at C & C Bank of Knox County. Then also on November 2, 1979, Hal Y. Roe as general partner of Pellissippi Parkway, Ltd. wrote a check in the amount of $900,865.35 payable to himself. These funds together with the $400,000 from BRO-# 2 were deposited in Roe's personal account at UAB-K on November 2, 1979. Pellissippi Parkway, Ltd. was left with nearly $100,000 in working capital in its account.

14. From his personal account, Roe wrote check # 1101 to the Ridenour law firm for $4,225.50. Roe also wrote his personal checks # 1102 in the amount of $746,639.85 and # 1103 in the amount of $550,000.00 to United American Bank of Knoxville. These checks were dated November 1, 1979. In return, Roe received UAB-K cashier's checks dated November 1, 1979. One check in the amount of $746,-639.85 was payable to Pioneer Fuel Sales Co., Inc., while the other for $550,000.00 was payable to W.C. Pendleton.

15. In return for the $550,000 cashier's check, it appears that William Pendleton transferred his ownership of 100% of the stock of GEC to BRO-# 2. In return for the $746,639.85 cashier's check, it appears that Pioneer Fuel Sales transferred its ownership of the "Pellissippi Parkway" property to Hal Y. Roe on November 1, 1979. This Pellissippi Parkway property is the real estate where GEC was located.

Later, but also on November 1, 1979, Roe transferred ownership of the "Pellissippi Parkway" property to Pellissippi Parkway, Ltd.

16. On or about May 16, 1980, Hal Y. Roe executed a $250,000 note at C & C Bank of Roane County on behalf of GEC. ("Loan 3"). Of the $250,000 deposited in GEC's UAB-K account, $89,493.15 went to pay interest on Pellissippi Parkway's $1,000,000 loan at C & C Bank of Knox County, Loan 1.

17. On or about December 22, 1980, Hal Y. Roe executed a $300,000 note at C & C Bank of Washington County on behalf of H & R Machinery ("Loan 4"). These proceeds were deposited in GEC's UAB-K account. H & R Machinery was the John Deere dealer in Kingsport, Tennessee, which was acquired by GEC about this time.

18. The charters of GEC and H & R Machinery were amended by unanimous written consent of their shareholders on November 24, 1980, to change their names effective December 31, 1980, to Valley Machinery Corporation and Valley Machinery Corporation of Kingsport, respectively. Later, on April 30, 1982, Valley Machinery Corporation of Kingsport was merged into Valley Machinery. Valley Machinery was also given the Chattanooga John Deere dealership when the previous dealer, Al Kelley, went out of business.

19. Around the end of 1980, John Deere had been urging Valley Machinery to bring in someone with more heavy-machinery experience. As a result, Mike R. Allen was hired in January, 1981, as vice-president and general manager of Valley Machinery. Allen, who has a B.S. degree in retailing and distributing, had previously worked with Mitchell Distributing Company of North Carolina, though he had been based in Bristol, Virginia. Allen had day-to-day operational control of the business. Allen now resides in Altamonte Springs, Florida, a suburb of Orlando, where he does some consulting work for Grand Junction restaurants.

20. About January 20, 1981, or about 3 weeks after GEC changed its name to Valley Machinery, Hal Roe's purported signature appears on a $690,000 note with United American Bank of Washington County now known as First Peoples Bank of Washington County in the name of GEC ("Loan 5"). The proceeds of this loan were deposited into Valley Machinery's account.

21. On April 23, 1981, Hal Y. Roe signed a $250,000 note on behalf of Valley Machinery at C & C Bank of Washington County ("Loan 6") which proceeds were deposited in Valley Machinery's UAB–K account and among other things was used to pay $34,377.12 in interest on GEC's $690,000 loan with C & C Bank of Washington County, Loan 5.

22. In May, 1981, Valley Machinery obtained a $375,000 loan from the Bank of Commerce in Morristown ("Loan 7"). This note was signed by Hal Y. Roe. These funds were deposited to Valley Machinery's account.

23. On June 12, 1981, a charter was filed for Valley Rental & Leasing, Inc. ("Valley Rental"), a corporation organized for the purpose of renting and leasing John Deere equipment. The charter of this corporation provided:

7. The corporation will not commence business until consideration of One Thousand and no/100 ($1,000.00) Dollars has been received for the issuance of shares.

This provision is required by T.C.A. § 48–202(e)(iv).

24. The minutes of the corporation reveal that J. Michael Winchester of the law firm of Ridenour, Ridenour, Ridenour, Ridenour, Bowers, Shumate, McCloyd & Lacy was the incorporator and after adopting by-laws for the corporation, he agreed to sell 500 shares of Valley Rental stock to Hal Y. Roe for $100 per share on June 15, 1981. An unsigned stock subscription agreement to this effect is also in the minutes. Unsigned corporate minutes indicate Roe was present at a special stockholders' meeting later on June 15, 1981, and elected himself, Jake Butcher, Sonya Butcher, Helen Kimbrough, and Judy Franklin as directors of the company.

Additional unsigned corporate minutes reflect that these directors then elected the following officers: Jake F. Butcher—Chairman; Hal Y. Roe—President; Mike R. Allen—Vice President; Ray Milton—Controller; Helen Kimbrough—Treasurer and Assistant Secretary; Judy Franklin—Secretary. The next annual meeting was scheduled for June 12, 1982.

25. On August 12, 1981, Valley Rental's corporate minutes indicate a name change to Valley Machinery Rental & Leasing, Inc. was approved and documents to so amend the charter were filed with the Secretary of State on August 17, 1981. No stock was ever legally issued by this corporation. Though there is no record of a Board of Directors meeting on August 13, 1981, Judy Franklin as secretary certified a corporate resolution was entered in the minute book on that date authorizing Hal Roe, Mike Allen, Ray Milton, and Judy Franklin to draw funds on Valley Rental's bank accounts at UAB–K.

UAB–K records show a checking account was opened by Hal Y. Roe for Valley Rental on August 14, 1981, and that the four above-listed persons were authorized signatories. Though there is no subsequent corporate resolution, James H. Carroll is substituted for Ray Milton on another signature card. There are no records of any June 12, 1982 shareholder's meeting or any other action until September 15, 1982. No stock certificates were ever issued either to anyone including Roe or Allen.

26. On August 13, 1981, Hal Y. Roe signed a $900,000 note on behalf of Valley Rental at UAB-Nashville secured by all equipment, furniture, and fixtures ("Loan 8"). The note called for monthly payments of $18,500.

27. On August 14, 1981, Hal Y. Roe signed a $350,000 ninety-day promissory note individually with C & C Bank of Anderson County ("Loan 9"). Roe states that $50,000 of this amount was supposed to represent his capital contribution to Valley Rental and the Valley Machinery note

should have only been for $300,000 back to him. As a result, there was no capital contribution to Valley Rental prior to beginning its corporate existence, as shown by its August 13, 1981, note at UAB-Nashville.

28. C & C Bank of Anderson County subsequently sold Roe's note representing Loan 9 to UAB-K about November 8, 1981, where it was renewed by Roe in the same principal amount on November 12, 1981, February 10, 1982, May 11, 1982, and August 9, 1982.

29. Valley Rental did not pay salaries to any employees and did not have a separate office or building of its own. Rather it operated from the same offices as Valley Machinery and did not even have a separate telephone listing. Valley Rental would rent equipment on a daily, weekly, or monthly basis and would sell equipment. It bought essentially all of its equipment from Valley Machinery. Valley Rental did not pay rent and was able to use the sales and accounting staff of Valley Machinery.

30. Sometime in the latter half of 1981, after the formation of Valley Rental, James H. Carroll, a long-time friend of Mike Allen, was brought in as controller. Carroll kept the books for Valley Rental, Valley Machinery, and Pellissippi Parkway, Ltd., all from the same office. ·

31. On September 17, 1981, Roe signed a $24,437.32 ninety-day promissory note, individually, with UAB-K ("Loan 10"). This $24,437.32 was not given to Valley Machinery. The note was renewed on December 16, 1981. On March 15, 1982, this note was again renewed and joined with an additional $200,000 from UAB-K ("Loan 11"). This $224,437.32 note, Loan 11, was renewed upon June 14, 1982, and September 13, 1982. The additional $200,000 proceeds from Loan 11 were deposited to Roe's account and transferred by his personal check to Valley Machinery. In return, Roe received Valley Machinery's note in the amount of $224,437.32 on March 15, 1982.

32. On January 4, 1982, Roe signed a $250,000 ninety-day promissory note at UAB-K in his individual capacity ("Loan 12"). This note was renewed upon April 5, 1982, and July 6, 1982. The $250,000 proceeds of Loan 12 were deposited in Roe's personal account upon January 4, 1982. Roe's personal check # 1694 dated December 30, 1981, for $250,116.44 was payable to C & C Bank of Knox County. The check created an overdraft in Roe's account and did not clear until the Loan 12 proceeds were deposited in his account. This check apparently paid a loan at C & C Bank of Knox County. Roe took back the note of Valley Machinery in the amount of $250,-000 signed by Mike R. Allen.

33. On April 28, 1982, Roe individually signed a $150,000 promissory note at UAB-K ("Loan 13") which was renewed on July 27, 1982. After the $150,000 proceeds of Loan 13 were deposited in his account Roe wrote his personal check in that amount payable to Pellissippi Parkway, Ltd. and took back a note in that same amount from Valley Machinery signed by Mike Allen.

34. On July 7, 1982, Roe received a $175,000 note from Valley Machinery signed by Mike Allen. On July 23, 1982, Roe individually signed a promissory note in the amount of $175,000 with UAB-K ("Loan 14") which proceeds were deposited in his account and then paid to Valley Machinery by his personal check.

35. On August 19, 1982, Allen individually signed a $100,000 promissory note at UAB-K ("Loan 15") and deposited the proceeds in his account. Then in return for Allen's $100,000 check, Valley Machinery, by its president, Hal Y. Roe, executed a $100,000 note in Allen's favor.

36. On December 29, 1981, Roe had discussed his resignation with Jake Butcher. In the meanwhile, Roe looked for another business opportunity until in July of 1982 *when he was advised of his possible liability as general partner of Pellissippi Parkway.* In August and September of 1982, Butcher asked Roe if he knew what he was going to do and Roe decided to go ahead and resign. On September 13, 1982,

he told Butcher he intended to resign and they met on September 15 to talk about the resignation and Roe's personal notes.

37. As of September 15, 1982, Roe had individual notes at UAB–K with total outstanding principal of $1,149,457.32 (Loans 9, 11, 12, 13 and 14). The accrued interest was computed to be $24,696.17 for a total debt of $1,174,153.49. Roe also had five notes payable by Valley Machinery in total principal amount of $1,149,457.32. Mike Allen also had a note in the principal amount of $100,000 outstanding to UAB–K with accrued interest computed as $1,438.35.

38. The deposits of UAB-Knoxville and UAB–C were both state banks insured by the FDIC. Neither of these banks was a member bank of the Federal Reserve System.

39. 12 U.S.C. § 1828(j) provides in part: (2) The provisions of section 22(h) of the Federal Reserve Act, as amended, relating to limits on loans and extensions of credit by a member bank to its executive officers or directors or to any person who directly or indirectly owns, controls, or has the power to vote more than 10 per centum of any class of voting securities of such member bank, ..., or to companies controlled by such an executive officer, director, or person, ... shall be applicable to every nonmember insured bank in the same manner and to the same extent as if such nonmember insured bank were a State member bank ...

(3)(A) Any nonmember insured bank which violates or any officer, director, employee, agent, or other person participating in the conduct of the affairs of such nonmember insured bank who violates any provision of section 23A or 22(h) of the Federal Reserve Act, as amended, or any lawful regulation issued pursuant thereto, shall forfeit and pay a civil penalty of not more than $1,000 per day for each day during which such violation continues ..." ·

40. 12 U.S.C. § 375b is Section 22(h) of the Federal Reserve Act and provides:

(1) No member bank shall make any loan or extension of credit in any manner to any of its executive officers, or to any person who directly or indirectly or acting through or in concert with one or more persons owns, controls, or has the power to vote more than 10 per centum of any class of voting securities of such member bank, ... or to any company controlled by such an executive officer or person, ... where the amount of such loan or extension of credit, when aggregated with the amount of all other loans or extensions of credit then outstanding by such bank to such executive officer or person and to all companies controlled by such executive officer or person ... would exceed the limits on loans to a single borrower established by section 5200 of the Revised Statutes, as amended. For purposes of this paragraph, the provisions of section 5200 of the Revised Statutes, as amended, shall be deemed to apply to a State member bank as if such State member bank were a national banking association.

(2) No member bank shall make any loan or extension of credit in any manner to any of its executive officers or directors, or to any person who directly or indirectly or acting through or in concert with one or more persons owns, controls, or has the power to vote more than 10 per centum of any class of voting securities of such member bank, or to any company controlled by such an executive officer, director, or person ... where the amount of such loan or extension of credit, when aggregated with the amount of all other loans or extensions of credit then outstanding by such bank to such executive officer, director, or person and to all companies controlled by such executive officer, director, or person ... would exceed an amount prescribed in a regulation of the appropriate Federal banking agency, unless such loan, line of credit, or extension of credit is approved in advance by a majority of the entire board of directors with the interested

party abstaining from participating directly or indirectly in the voting.

(3) No member bank shall make any loan or extension of credit in any manner to any of its executive officers or directors, or to any person who directly or acting through or in concert with one or more persons, owns, controls or has the power to vote more than 10 per centum of any class of voting securities of such member bank, or to any company controlled by such executive officer, director, or person, ... unless such loan or extension of credit is made on substantially the same terms, including interest rates and collateral, as those prevailing at the time for comparable transactions with other persons and does not involve more than the normal risk of repayment or present other unfavorable features.

41. Section 5200 of the Revised Statutes as amended provides:

(a)(1) The total loans and extensions of credit by a national banking association to a person outstanding at one time and not fully secured, as determined in a manner consistent with paragraph (2) of this subsection, by collateral having a market value at least equal to the amount of the loan or extension of credit shall not exceed 15 per centum of the unimpaired capital and unimpaired surplus of the association.

(2) The total loans and extensions of credit by a national banking association to a person outstanding at one time and fully secured by a readily marketable collateral having a market value, as determined by reliable and continuously available price quotations, at least equal to the amount of the funds outstanding shall not exceed 10 per centum of the unimpaired capital and unimpaired surplus of the association. This limitation shall be separate from and in addition to the limitation contained in paragraph (1) of this subsection.

42. The applicable regulations issued to enforce these statutes are: 12 C.F.R. § 337.1 which provides:

The provisions of this part apply to certain banking practices which are likely to have adverse effects on the safety and soundness of insured State nonmember banks or which are likely to result in violations of law, rule, or regulation. 12 C.F.R. § 337.3 which provides:

(a) With the exception of §§ 215.5, 215.8, 215.9, and 215.10, insured nonmember banks are subject to the restrictions contained in subpart A of Federal Reserve Board Regulation O (12 CFR Part 215) to the same extent and to the same manner as though they were member banks.

(b) For the purposes of compliance with § 215.4(b) of Federal Reserve Board Regulation O, no insured nonmember bank may extend credit or grant a line of credit to any of its executive officers, directors, or principal shareholders or to any related interest of any such person in an amount that, when aggregated with the amount of other all extensions of credit and lines of credit by the bank to that person and to all related interests of that person, exceeds the greater of $25,000 or five percent of the bank's capital and unimpaired surplus, or $500,-000 unless (1) the extension of credit or line of credit has been approved in advance by a majority of the entire board of directors of that bank and (2) the interested party has abstained from participating directly or indirectly in the voting.

and the Federal Reserve Board's Regulation O, 12 C.F.R. Part 215. Subpart A of Regulation O governs any extension of credit by a member bank to an executive officer, director or principal shareholder of the bank, as well as to any company controlled by such a person or a political or campaign committee that benefits or is controlled by such a person.

Control of a company or bank is defined to mean:

that a person directly or indirectly, or acting through or in concert with one or more persons:

(i) Owns, controls, or has the power to vote 25 percent or more of any class of voting securities of the company or bank;

(ii) Controls in any manner the election of a majority of the directors of the company or bank; or

(iii) Has the power to exercise a controlling influence over the management or policies of the company or bank.

A person is presumed to have control of a company or bank if:

(i) The person is (A) an executive officer or director of the company or bank and (B) directly or indirectly owns, controls, or has the power to vote more than 10 percent of any class of voting securities of the company or bank; or

(ii)(A) The person directly or indirectly owns, controls, or has the power to vote more than 10 percent of any class of voting securities of the company or bank, and (B) no other person owns, controls, or has the power to vote a greater percentage of that class of voting securities. 12 C.F.R. § 215.2(b).

The lending limit for a member bank is defined as:

an amount equal to the limit of loans to a single borrower established by section 5200 of the Revised Statutes. 12 U.S.C. 84. This amount is 15 percent of the bank's unimpaired capital and unimpaired surplus in the case of loans that are not fully secured, and an additional 10 percent of the bank's unimpaired capital and unimpaired surplus in the case of loans that are fully secured by readily marketable collateral having a market value, as determined by reliable and continuously available price quotations, at least equal to the amount of the loan. 12 C.F.R. § 215.2(f).

The general prohibitions against lending to insiders are contained in 12 C.F.R. § 215.4:

(a) No member bank may extend credit to any of its executive officers, directors, or principal shareholders or to any related interest of that person unless the extension of credit: (1) is made on substantially the same terms, including interest rates and collateral, as those prevailing at the time for comparable transactions by the bank with other persons that are not covered by this Part and who are not employed by the bank, and (2) does not involve more than the normal risk of repayment or present other unfavorable features.

(b) *Prior Approval.* (1) No member bank may extend credit (which term includes granting a line of credit) to any of its executive officers, directors, or principal shareholders or to any related interest of that person in an amount that, when aggregated with the amount of all other extensions of credit to that person and to all related interests of that person exceeds the higher of $25,000 or 5 percent of the member bank's capital and unimpaired surplus, unless: (i) The extension of credit has been approved in advance by a majority of the entire board of directors of that bank, and (ii) the interested party has abstained from participating directly or indirectly in the voting. In no event may a member bank extend credit to any one of its executive officers, directors, or principal shareholders, or to any related interest of that person, in an amount that, when aggregated with all other extensions of credit to that person, and all related interests of that person, exceeds $500,000, except by complying with the requirements of this paragraph.

\*     \*     \*     \*     \*     \*

(3) Participation in the discussion, or any attempt to influence the voting, by the board of directors regarding an extension of credit constitutes indirect participation in the voting by the board of directors on an extension of credit.

(c) *Aggregate Lending Limit.* No member bank may extend credit to any of its executive officers or principal shareholders or to any related interest of that person in an amount that, when aggregated with the amount of all other extensions of credit by the member bank to that person and to all related interests of that person, exceeds the lending limit of

the member bank specified in § 215.2(f) above. . . .

In addition, T.C.A. § 45–2–1102(a) provides: (1) Except as provided in this section, no state bank shall be allowed to lend any one (1) person, firm or corporation (including loans to a firm or loans to the several members thereof) more than fifteen percent (15%) of its capital, surplus and undivided profits. However, such loans may be in excess of that percent, but not above twenty-five percent (25%) except as provided in paragraph (b) below, if each specific loan in excess of fifteen percent (15%) is first submitted to and approved in advance in writing by the board of directors or by the finance committee of said bank and a record is kept of such written approval.

43. The effect of Mike Allen and Hal Y. Roe borrowing in their individual capacity, rather than letting Valley Machinery borrow in its own name, was to prevent UAB–K from showing that loan proceeds went to an entity owned by Jake Butcher, and to circumvent the necessity for board approval for such loans. In addition, by placing these loans in the names of individuals, the effect was to deceive bank examiners who could not properly determine the concentration of the bank's loans in Butcher controlled companies. By obtaining these loans, Mike Allen and Hal Roe lent themselves to a joint enterprise or scheme and acted in concert with Jack Butcher and others to violate the banking laws and to defraud UAB–K.

44. As of the middle of September, 1982, Roe decided to get out of Valley Machinery. On September 15, 1982, Roe and Butcher met to discuss his leaving. Lee Beeman contacted Roe later that day and Roe informed him that he needed to be relieved of both his personal liability on the notes and his Valley Rental stock. Lee Beeman was formerly the controlling shareholder of C & C Bank of McMinn County. He was paid $1,000 per month by Valley Machinery for financial consulting.

45. As a result of this September 15, 1982, conversation, a list was prepared showing the total pay-off as of September 15, 1982, on all of Hal Roe's loans, Loan 9, Loan 11, Loan 12, Loan 13, and Loan 14. This total was $1,174,153.49. Mike Allen then signed a six-month promissory note in this amount dated September 15, 1982, at UAB–K on behalf of Valley Rental for the stated purpose of buying out Hal Roe ("Loan 16"). This money was not deposited to Valley Rental's account until September 17 and it is likely that the note was pre-dated. By note dated September 16, 1982, in the amount of $404,000 with UAB–C ("Loan 17") which is the subject of this lawsuit, Valley Rental obtained an additional $400,000. This note was also signed by Mike Allen and since these funds were deposited in Valley Rental's account upon September 16, 1982, it is likely that this note was postdated.

46. The aggregate amount of the proceeds from these two loans which were comingled was $1,574,153.49. By its check of September 16, 1982, Valley Rental paid $1,575,000 to Valley Machinery which was deposited in Valley Machinery's account upon September 17. Also upon September 17, 1982, Valley Machinery issue its check # A17586 in the amount of $101,438.35 and # A17596 in the amount of $50,000 to Mike R. Allen in return for cancelling its $100,000 note to Mike Allen of August 19, 1982. These checks were deposited in Mike Allen's personal account.

Valley Machinery also issued its checks # A17587 in the amount of $674,153.49 and # A17595 in the amount of $450,000 to Hal Roe in payment of its notes to him of August 14, 1981, January 4, 1982, March 15, 1982, April 27, 1982; and July 7, 1982.

47. Allen also issued his personal check # 414 dated September 15, 1982, for $50,000 payable to Hal Roe in exchange for the stock of Valley Rental and his check # 431 dated September 14, 1982, to UAB–K to retire his $100,000 personal note of August 19, 1982, Loan 15. UAB records show the note as closed upon September 23, 1982, though the transaction form indicates the effective date was September 17, 1982.

48. Hal Roe deposited the two Valley Machinery checks totalling $1,124,153.49 and Mike Allen's check for $50,000 in his personal account on September 17, 1982, as shown by his account statement and deposit slip. Roe then issued his personal check # 1605 in the amount of $1,174,153.49 dated September 15, 1982, to UAB–K in payment of his five outstanding promissory notes, Loan 9, Loan 11, Loan 12, Loan 13, and Loan 14.

49. The net effect of these transactions was to transfer over one and a quarter million dollars of debt from Hal Roe and Mike Allen individually to Valley Rental. When saddled with this additional debt, Valley Rental had total outstanding notes of nearly two and one half million dollars. Its earnings were dependent upon those of Valley Machinery, a company which had incurred operating losses for the past three years and had over 2 million dollars in short term debt. Valley Rental also had a monthly obligation of $18,500 on Loan 8 at UAB-Nashville. Neither has Valley Rental established that it had any assets. Accordingly, Valley Rental was unable to pay its debts to UAB–K, UAB–C and UAB–N as they came due, both before and after it took out Loans 16 and 17 in the middle of September, 1982.

50. In addition to Valley Rental's insolvency, other incidents of the "buy-out" of Hal Roe include the inconsistent dating of the checks, notes, and deposit slips involved; the hurriedness of the transaction; Mike Allen's paying exactly $50,000 for the stock of Valley Rental, the same amount that Hal Roe had purportedly paid for it; that subsequent to the "buy-out", Valley Rental's normal monthly income prior to expenses was only in the neighborhood of $5,000; and that there were no contracts or documents describing the transaction and no stock certificate of Valley Rental was ever transferred to or issued to Mike Allen.

51. From the overwhelming circumstantial evidence both Hal Roe and Mike Allen knew or should have known that the "buy-out" of Hal Roe was being effected through improper means. If Roe and Allen did not have actual knowledge, it was due to a conscious effort to remain ignorant of the transaction. As will be seen from Exhibit 200, which was prepared in behalf of defendant Allen in April of 1982, the "companies" over which Roe, Allen, Butcher and others had control, were saddled with debts approximating $8,000,000, and Roe and Allen both knew that Valley Machinery and Valley Rental were insolvent and in dire financial straits. Both Roe and Allen lent themselves to a scheme in concert with Jake Butcher, Jesse Barr and others to defraud the UAB–K and the UAB–C, to deceive bank examiners and violate the banking and corporation laws. All of these actors were engaged in a joint enterprise which resulted in a $404,000 loss to UAB–C together with accrued interest from September 16, 1982.

52. The debts incurred by Valley Rental which served to pay off obligations of Valley Machinery, and thence obligations of Roe and Allen, were not made in a good faith exchange for property or obligation and were not a fair equivalent of the value, if any, received by Valley Rental.

53. After the conveyance of the loan proceeds from Valley Rental to Valley Machinery, Valley Rental was left without any capital.

54. The taking out of loans 16 and 17 by Valley Rental was part of a scheme involving Butcher, Barr, Roe, and Allen, and perhaps others, to hinder, delay and defraud state banking institutions.

55. As will be seen from Exhibits 10 and 11, Roe made false affidavits with regard to the value of real estate acquired by him and then deeded to Pellissippi Parkway, Ltd., on that same date, or on November 1, 1979. Thereafter, as will be seen from Exhibits 51 and 52, Roe apparently submitted false personal financial statements for the purpose of obtaining some of the loans here involved as such do not list any personal liability on personal loans involved herein. Likewise, as will be seen from Exhibits 91, 92 and 93, Roe apparently furnished false financial statements with regard to Valley Machinery and General Equipment Company.

56. Although Roe has contended that he submitted his resignation to Jake Butcher

on September 15, 1982, he continued to work at least up through October 17, 1982, and was paid through May of 1983, at which time he was given a note from Valley Machinery for an additional six months of severance pay.

57. Turning back to August 14, 1981, it should be noted that all of Roe's loans with UAB–K were paid through loans obtained from other Butcher banks before the bank examiners arrived at UAB–K that date (Exhibit 165).

## CONCLUSIONS OF LAW

1. Jurisdiction in this Court is appropriate pursuant to 12 U.S.C. § 1819(4).

2. The FDIC is a corporation originally established during the economic and banking crisis of the early 1930s when thousands of banks were forced to close their doors. It was created to restore and reinforce public confidence in the banking system, to promote safe and sound banking practices and the stability of banks, to obviate runs on banks by depositors, to safeguard deposits through deposit insurance, and to prevent the recurrence of the events of 1931 and 1932 which sapped banking strength and climaxed in the "bank holiday" of March, 1933. *Doherty v. United States,* 94 F.2d 495 (8th Cir.1938), *Weir v. United States,* 92 F.2d 634 (7th Cir.1937). See Presidential Proclamations 2039, March 6, 1933, and 2040, March 9, 1933.

3. Considering first the plaintiff's theory of piercing the corporate veil, the doctrine that a corporation is a legal entity existing separate and apart from the persons composing it is a legal theory introduced for the purposes of convenience. The concept cannot, therefore, be extended to a point beyond its reason and policy, and when invoked in support of an end subversive of this policy, will be disregarded by the courts. Thus, in an appropriate case and in furtherance of the ends of justice, a corporation and the individual or individuals owning all its stock and assets will be treated as identical, the corporate cloak being disregarded where used as a cover for fraud or illegality and the corporation and individual or individuals owning all its stock and assets will be treated as identical. See *Corporations,* 18 Am.Jur.2d § 14, p. 599, *Annot.,* 63 A.L.R.2d 1051, *Bangor Punta Operations v. Bangor & A.R. Co.,* 417 U.S. 703, 713, 94 S.Ct. 2578, 2584, 41 L.Ed.2d 418, 427 (1974).

4. Factors to be considered in determining whether to disregard the corporate veil include not only whether the entity has been used to work a fraud or injustice in contravention of public policy, but also: (1) whether there was a failure to collect paid in capital; (2) whether the corporation was grossly undercapitalized; (3) the nonissuance of stock certificates; (4) the sole ownership of stock by one individual; (5) the use of the same office or business location; (6) the employment of the same employees or attorneys; (7) the use of the corporation as an instrumentality or business conduit for an individual or another corporation; (8) the diversion of corporate assets by or to a stockholder or other entity to the detriment of creditors, or the manipulation of assets and liabilities in another; (9) the use of the corporation as a subterfuge in illegal transactions; (10) the formation and use of the corporation to transfer to it the existing liability of another person or entity; and (11) the failure to maintain arms length relationships among related entities. *G.M. Leasing v. United States,* 514 F.2d 935 (10th Cir.1975), *Valley Finance, Inc. v. United States,* 629 F.2d 162 (D.C.Cir.1980), *DeWitt Truck Brokers v. W. Ray Flemming,* 540 F.2d 681 (4th Cir.1976), *United States v. Pisani,* 646 F.2d 83 (3rd Cir.1981), *Associated Vendors, Inc. v. Oakland Meat Co.,* 210 Cal.App.2d 825, 26 Cal.Rptr. 806, 813–815, (1963), *Neese v. Fireman's Fund Ins. Co.,* 53 Tenn.App. 710, 386 S.W.2d 918 (1964), *Oak Ridge Auto Repair Service v. City Finance Co.,* 57 Tenn.App. 707, 425 S.W.2d 620 (1967).

5. In addition, when a corporation is dominated by an individual or individuals not only as to finance but also as to policy and business practices so that the corporation has no mind, will, or existence of its own and this domination is used to commit a wrong, or fraud or perpetrate a violation of statutory or positive legal duty, the cor-

porate veil will be pierced. *Continental Bankers Life v. Bank of Alamo,* 578 S.W.2d 625 (Tenn.1979). *Mayo v. Pioneer Bank & Trust Co.,* 274 F.2d 320 (5th Cir. 1960).

■ 6. From the facts set forth above, neither Valley Rental nor Valley Machinery is entitled to the legal respect accorded legitimate corporations and the corporate fiction will be disregarded. Since both Roe and Allen participated in the control and domination of Valley Rental for Butcher's and their own purposes, they will each be individually liable for its debts.

7. The $404,000 loan here sued upon and the $1,174,153.49 loan from UAB–K were obtained and co-mingled and a major part of these comingled funds benefitted Hal Roe. The $404,000 loan here in question was part and parcel of a three-year course of fraudulent conduct, an ongoing scheme which included the use of false financial statements, and the shifting of loans from institution to institution in order to circumvent the federal laws and regulations pertaining to insider loans and to further a scheme to defraud the bank and its examiners.

8. As to the plaintiff's theory of fraudulent conveyances, it appears that because the saleable value of the assets of Valley Rental after taking out Loans 16 and 17 was less than the amount required to pay Valley Rental's liability on its debts as they matured, Valley Rental was insolvent under T.C.A. § 66–3–302. In fact, it appears that Valley Rental was insolvent before taking out those loans. Both Roe and Allen looked to the possibility of enormous personal gain and both were willing participants in an ongoing scheme to defraud the bank, its examiners, etc., and the main purpose in setting up Valley Rental was to use that company to borrow money.

9. Accordingly, because Valley Rental did not receive fair consideration for its transfer of $1,575,000 to Valley Machinery, the conveyance was fraudulent under T.C.A. § 66–3–305. The conveyance was also in fraud of the creditors of Valley Rental under T.C.A. § 66–3–306 and was made with intent to defraud under T.C.A.

§ 66–3–308. *Blount v. Dunn,* 10 Tenn. App. 95 (1929), *State v. Nashville Trust Co.,* 28 Tenn.App. 388, 190 S.W.2d 785 (1944), *Calhoun v. Baylor,* 646 F.2d 1158 (6th Cir.1981).

10. Because Roe and Allen participated in the fraud, they are personally liable in addition to Valley Rental and Valley Machinery. *State v. Nashville Trust Co.,* 28 Tenn.App. 388, 190 S.W.2d 785 (1944). See also T.C.A. § 66–3–310. The Court notes that the fraudulent scheme of which Roe and Allen were a part included obtaining extensions and renewals of credit by false pretenses and false representations other than respecting their financial condition. In addition, Allen and Roe made or contributed to the making of written statements respecting aspects of their and Valley Machinery's and Valley Rental's financial condition which were materially false, made with the intent to deceive, and upon which UAB–C and UAB–K should have relied in extending credit.

11. Finally, the defendant Allen is precluded from asserting any "agreement" contrary to the terms of the note which does not appear in the writings of UAB–C. *D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942); 12 U.S.C. § 1823(e).

■ 12. As a matter of federal common law, the FDIC enjoys the status similar to, and in some cases superior to, that of a holder in due course. *FDIC v. Leach,* 525 F.Supp. 1379 (E.D.Mich.1981), *FDIC v. Vogel,* 437 F.Supp. 660 (E.D.Wis.1977), *FDIC v. Rockelman,* 460 F.Supp. 999 (E.D.Wis. 1978).

■ 13. Though Mike Allen in signing the subject note indicated the person he represented, Valley Rental, he failed to indicate his representative capacity. Under T.C.A. § 47–3–403(2)(b) this renders Allen personally liable on the note to the FDIC because the FDIC was not an immediate party to the note. *See, American Exchange Bank v. Cessna,* 386 F.Supp. 494 (N.D.Okl.1974), *Financial Associates v. Impact Marketing, Inc.,* 90 Misc.2d 545, 394 N.Y.S.2d 814, 21 U.C.C.Rep.Serv. 1369 (1977), contrast with *Acme Metals, Inc. v.*

*Weddington,* 575 S.W.2d 15 (Tenn.App. 1978) (involving an immediate party). Regardless of Allen's failure to indicate his representative capacity on the note sued upon herein, it should be noted that no stock was ever issued by Valley Rental to anyone including Roe and Allen (Finding of Fact 25), and there was no capital contribution to Valley Rental & Leasing Co., Inc., prior to its beginning its purported corporate existence (Findings of Fact 27, 29 and 35). T.C.A. § 48–204.

14. A judgment will enter in accordance with this opinion awarding the FDIC a judgment in the full amount of the note, $404,000, together with prejudgment interest against Valley Machinery, Valley Rental, Roe and Allen, jointly and severally. In addition, a judgment against Allen and Valley Rental in favor of the FDIC will enter for the full amount of the note together with interest and attorney's fees.

An appropriate order will enter.