FILED

07/17/2018

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
June 6, 2018 Session

## CARLENE GUYE JUDD v. CARLTON GUYE

**Appeal from the Chancery Court for Davison County**
**No. 16-0277-II      William E. Young, Chancellor**

_____

### No. M2017-01791-COA-R3-CV

_____

Plaintiff, a shareholder in the corporation at issue who obtained a judgment against the corporation in a prior action, now seeks to pierce the corporate veil to hold the other shareholder personally liable for the balance owing on the judgment. The trial court summarily pierced the corporate veil and held the defendant shareholder personally liable for the corporation's debt to Plaintiff. The defendant shareholder appeals arguing, *inter alia*, that the trial court erred in allowing Plaintiff to pierce the veil of her own corporation. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT and JOHN W. MCCLARTY, JJ., joined.

Dan E. Huffstutter, Nashville, Tennessee, for the appellant, Carlton Guye.

Jay S. Bowen and Lauren Kilgore, Nashville, Tennessee, for the appellee, Carlene Guye Judd.

### OPINION

This is the second action involving Carlene Guye Judd ("Plaintiff") and Carlton Guye ("Defendant"), who are siblings and were equal shareholders of West Meade Decorating Company, Inc. ("WMDC"). In a previous action among the same parties, *Carlene Guye Judd, individually and in the right of West Meade Decorating Company, Inc. v. Carlton Guye and West Meade Decorating Company, Inc.,* Case No. 13-0161-II, Plaintiff sued Defendant and WMDC, in her individual capacity, and derivatively, as a shareholder. Plaintiff asserted claims for judicial dissolution of WMDC, an accounting, the appointment of a receiver to wind up the business, and a shareholder derivative action

on behalf of the company to recover funds misappropriated by Defendant for his personal use, and assets he wrongfully converted.

On February 7, 2013, following a two day trial, the Davidson County Chancery Court made extensive findings of fact and ruled, *inter alia*, that Defendant had abused the corporate structure for his personal benefit and to the detriment of Plaintiff and the company. The court awarded Plaintiff, in her individual capacity, a judgment against WMDC in the amount of $266,246.70. The court also awarded Plaintiff, in her derivative capacity for the benefit of WMDC, a judgment against Defendant for $239,102.79. The judgment of the chancery court in the prior action was affirmed in *Judd v. Guye*, No. M2015-00094-COA-R3-CV, 2015 WL 9311847, at *1 (Tenn. Ct. App. Dec. 21, 2015), and is now res judicata.

Defendant satisfied the judgment he owed to WMDC; however, WMDC was only able to satisfy a portion of the judgment owed to Plaintiff, leaving an outstanding balance of $161,147.56. Because WMDC failed to completely satisfy the judgment, Plaintiff commenced this action to pierce the corporate veil of WMDC in order to hold Defendant personally liable for the remaining balance.

In this case, Plaintiff filed a motion for summary judgment relying almost exclusively on the Chancellor's factual findings in the previous action. Defendant opposed the motion arguing that Plaintiff's claims constituted "reverse piercing" of the corporate veil, which remedy is generally unavailable in Tennessee.[1] The Chancellor found that the claim at issue was not one of reverse veil piercing, but instead it was more akin to when one shareholder, who is a creditor of the corporation, is seeking to hold another shareholder liable by piercing the corporate veil. The Chancellor also concluded that a shareholder may pierce the corporate veil of the shareholder's own corporation when the dominant or controlling shareholder disregards the corporate form and thereby harms the other shareholder. Accordingly, and by relying on the findings of fact from the prior action, the Chancellor granted summary judgment to Plaintiff. This appeal followed.

---

[1] "Reverse piercing" is when a creditor seeks to hold the corporation accountable for the actions of its shareholders. *See Mfrs. Consolidation Serv., Inc. v. Rodell*, 42 S.W.3d 846, 866 (Tenn. Ct. App. 2000) (quoting *American Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir.1997)).

"While the Tennessee Supreme Court has recognized the concept of reverse piercing, it did so in the context of a parent/subsidiary relationship, as opposed to the corporation/shareholder, or trust/beneficiary relationship." *Nadler v. Mountain Valley Chapel Bus. Tr.*, No. E2003-00848-COA-R3-CV, 2004 WL 1488544, at *4 (Tenn. Ct. App. June 30, 2004) (citing *Cont'l Bankers Life Ins. Co. of the South v. Bank of Alamo*, 578 S.W.2d 625, 632-33 (Tenn.1979)). "While this court has addressed the issue of reverse piercing in the corporation/shareholder context, we have never adopted it." *Id*. (citations omitted).

ISSUES

Defendant presents two issues for us to consider, which read as follows:[2]

1.  Whether Tennessee recognizes an insider reverse pierce of the corporate veil as an enforceable remedy in Tennessee?

2.  Whether the circumstances of this Lawsuit justify [Plaintiff] utilizing the insider reverse pierce of the corporate veil mechanism to pierce the corporate veil of WMDC?

For her part, Plaintiff contends this is a frivolous appeal for which she is entitled to recover her attorney's fees on appeal.

## STANDARD OF REVIEW

This court reviews a trial court's decision on a motion for summary judgment de novo without a presumption of correctness. *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015) (citing *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997)). Accordingly, this court must make a fresh determination of whether the requirements of Tenn. R. Civ. P. 56 have been satisfied. *Id.*; *Hunter v. Brown*, 955 S.W.2d 49, 50-51 (Tenn. 1997). In so doing, we consider the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn. 2002).

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04.

When a motion for summary judgment is made and supported, as provided in Tenn. R. Civ. P. 56, the nonmoving party may not rest on the allegations or denials in its pleadings. *Id.* Instead, the nonmoving party must respond with specific facts showing that there is a genuine issue for trial. *Id.* A fact is material "if it must be decided in order to

---

[2] Without identifying it as an "issue" under his Statement of the Issues, as Tenn. R. of App. P. 27(a)(4) requires, Defendant contends in the Argument section of his brief that awarding Plaintiff damages after he satisfied his judgment to WDMC constitutes punitive damages. Because he failed to identify this as an Issue as our rules require, the issue has been waived. *See Cartwright v. Jackson Capital Partners, L.P.*, 478 S.W.3d 596, 615-16 (Tenn. Ct. App. 2015) (quoting *Flowers v. Bd. of Professional Responsibility*, 314 S.W.3d 882, 899 n.35 (Tenn. 2010). Moreover, Defendant cites no legal authority in support of this argument, which also constitutes a waiver. *See* Tenn. R. of App. P. 27(a)(7); *Bean v. Bean*, 40 S.W.3d 52, 55 (Tenn. Ct. App. 2000).

resolve the substantive claim or defense at which the motion is directed." *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993). A "genuine issue" exists if "a reasonable jury could legitimately resolve that fact in favor of one side or the other." *Id.*

## ANALYSIS

### I. PIERCING THE CORPORATE VEIL

The two issues raised by Defendant contend that the trial court erred by recognizing and utilizing the so-called reverse veil piercing remedy to hold Defendant personally liable for WMDC's obligations to Plaintiff.

We begin our analysis by noting that the ruling by the trial court did not constitute reverse veil piercing. The key distinctions between a traditional corporate veil piercing and reverse veil piercing are explained in *Reagan v. Connelly*, No. E2000-00451-COA-R3-CV, 2000 WL 1661524, at *6 (Tenn. Ct. App. Nov. 6, 2000):

> There are two distinct classes of cases involving the disregarding of the corporate identity. Most commonly, a corporation's veil is pierced for the benefit of creditors of the corporation, allowing them to proceed against the individuals who are the "true owners of the entity." The second class of piercing cases involves what is often referred to as "reverse piercing." In *Manufacturers Consolidation Service, Inc. v. Rodell*, . . . we explained the distinction between the more common piercing cases and the less common reverse-piercing cases as follows:
>
> "[W]hereas piercing analysis typically 'is used to hold individuals liable for the actions of a corporation they control,' reverse piercing 'seeks to hold a corporation accountable for actions of its shareholders.'"

(internal citations omitted).

When WMDC was unable to satisfy the judgment it owed Plaintiff from the prior action, Plaintiff initiated this action to pierce the veil of WMDC to hold Defendant personally liable. As explained above, this action constitutes a traditional veil piercing, as distinguished from a reverse piercing action in which a plaintiff is seeking to hold the corporation liable for obligations of a shareholder. Therefore, Defendant's reverse piercing argument is unavailing.

Here, the trial court held, as a matter of first impression in Tennessee, that a shareholder may pierce the corporate veil of the corporation to hold another shareholder personally liable when (1) the plaintiff shareholder has a personal judgment against the corporation and (2) the other shareholder acted as a dominant or controlling shareholder

to the detriment of the corporation or its shareholders. In reaching its conclusion, the trial court relied upon two cases from other jurisdictions. The trial court relied on the Missouri Court of Appeals holding in *Hibbs v. Berger*, 430 S.W.3d 296, 309 (Miss. Ct. App. 2014), which states:

> [E]quity requires a court to determine the applicability of piercing the corporate veil upon the particular facts of each case. *See* 2 Close Corp and LLCs: Law and Practice § 8:18 (Rev.3d ed.). Therefore, because piercing the corporate veil is one of equity, we, too, oppose and reject the trial court's conclusion that, *per se*, minority shareholders may not pierce their own corporate veil. Rather, we agree with the *Schattner* court and hold that under "appropriate circumstances" a minority shareholder may attempt to pierce the corporate veil and impose the corporate obligation upon another shareholder. *Schattner*, 668 F.2d at 1371. After all, if majority shareholders desire to be protected via the equitable doctrine of corporate veil piercing, then we should also require majority shareholders to operate under the same equitable principles by which they seek protection.

The trial court turned next to the New Jersey Superior Court in the case of *Walensky v. Jonathan Royce Int'l Inc.*, 624 A.2d 613 (N.J. Super. 1993), which dealt with the issue of a closely held corporation in which minority shareholders were defrauded due to the principal's disregard of corporate formalities. The *Walensky* court observed that

> [i]f a controlling stockholder uses a closed corporation as his personal business conduit, he may be held responsible for the debts of his "alter ego," particularly when substantial stock ownership, combined with other factors, clearly supports a disregard of the corporate fiction on grounds of fundamental equity and fairness.

*Walensky*, 624 A.2d at 617. (citing 18 C.J.S. Corporations § 14 at 283-84 (1990) (footnotes omitted)).

The situation in this case, however, does not deal with a majority or controlling shareholder; rather, it involves two shareholders who own equal shares in the company. Here, the trial court "acknowledge[d] that these cases discuss corporate veil piercing in the context of minority shareholders, but the Court finds that here, where there is a dominant shareholder versus a shareholder who suffered as a result of that dominant shareholder's actions, the same reasoning and analysis applies. . . ."

"A corporation is presumptively treated as a distinct entity, separate from its shareholders, officers, and directors." *Oceanics Sch., Inc. v. Barbour*, 112 S.W.3d 135, 140 (Tenn. Ct. App. 2003). However, in certain circumstances, "the corporate veil may be pierced and the acts of a corporation attributed to a shareholder." *Rogers v. Louisville*

*Land Co.*, 367 S.W.3d 196, 214 (Tenn. 2012). "Piercing the corporate veil is an equitable doctrine to prevent the use of a corporate entity to defraud or perform illegal acts." *Nepp v. Hart*, No. M2005-2024-COA-R3-CV, 2006 WL 2582503, at *7 (Tenn. Ct. App. Sept. 7, 2006). Therefore, the courts will generally disregard the corporate structure "where it is used as a cloak or cover for fraud or illegality, to work an injustice, to defend crime, or to defeat an overriding public policy, or where necessary to achieve equity." *Rogers*, 367 S.W.3d at 214-15 (*quoting* 18 Am. Jur. 2d *Corporations* § 57 (2004) (footnotes omitted)).

In order to pierce the corporate veil, the party seeking to pierce has the burden of presenting proof that shows the "corporate entity is a sham or a dummy or that disregarding the separate corporate entity is necessary to accomplish justice." *Id*. at 215 (internal citations and quotations omitted). When determining whether to disregard the corporate structure, the court is to look at the specific circumstances of the case. *Id*. Furthermore, the "[f]actors to be considered in determining whether to disregard the corporate veil include not only whether the entity has been used to work a fraud or injustice in contravention of public policy, but also" includes the following:

> (1) whether there was a failure to collect paid in capital; (2) whether the corporation was grossly undercapitalized; (3) the nonissuance of stock certificates; (4) the sole ownership of stock by one individual; (5) the use of the same office or business location; (6) the employment of the same employees or attorneys; (7) the use of the corporation as an instrumentality or business conduit for an individual or another corporation; (8) the diversion of corporate assets by or to a stockholder or other entity to the detriment of creditors, or the manipulation of assets and liabilities in another; (9) the use of the corporation as a subterfuge in illegal transactions; (10) the formation and use of the corporation to transfer to it the existing liability of another person or entity; and (11) the failure to maintain arms length relationships among related entities.

*Id*. (*citing CAO Holdings Inc. v. Trost*, 333 S.W.3d 73, 88 n. 13 (Tenn. 2010); *FDIC v. Allen*, 584 F. Supp. 386, 397 (E.D. Tenn. 1984)). In evaluating these factors, no single factor is conclusive, nor must all factors favor piercing the corporate veil; rather, a court will typically rely on a combination of the factors. *Id*. "However, in all events, the equities must 'substantially favor' the party requesting relief . . . and the presumption of the corporation's separate identity should be set aside only 'with great caution and not precipitately.'" *Id.* (internal citations omitted).

Here, the trial court found that the Chancellor's findings in the previous action justify piercing the corporate veil and having reviewed the relevant factors along with the factual findings from the previous action, we agree. As the following findings by the Chancellor in the previous action reveal, Defendant disregarded the corporate structure for his own benefit and to the detriment of Plaintiff:

Beginning in 2007-2008, at the time of the nationwide recession, the business of [WMDC] dropped off dramatically. The construction industry was negatively affected by the national economy, and, as a result, [WMDC] was not as profitable as it had been in prior years. Around this same time, [Mrs.] Judd noticed that her brother, Mr. Guye, was using the financial resources of [WMDC] for his own personal benefit. Mr. Guye has lived rent-free in an upstairs apartment in [WMDC] offices. The apartment was initially fitted out for other uses; however, after a bad experience, Mrs. Judd and Mr. Guye agreed that no one but family would use the upstairs premises. Mr. Guye converted the upstairs portion of that real estate into an apartment primarily used by him and his family as a resident during the week.

Not only does Mr. Guye live rent free in the apartment above the business operations of [WMDC's] building, but [WMDC] also pays for all of the utilities in the apartment. In addition, Mr. Guye used [WMDC] funds to pay for all of his insurance on his four personal vehicles which are insured, including a Mercedes Benz for his wife and a BMW for himself, for his family's cell phones and for his family's monthly cell phone bills. Mr. Guye also used [WMDC] funds to pay for his personal gasoline expenses, including gas used during vacations and personal trips, and for expenses incurred on those vacations and trips such as for hotels, lodging, food, and recreation.

Mr. Guye acknowledges that he used [WMDC] funds for his personal expenses. To the extent that he kept or maintained any receipts of those expenses, he did not provide them to Mrs. Judd to provide to the CPA so that those expenses could be attributed to Mr. Guye as personal income for tax purposes or for any other reason. Furthermore, Mr. Guye has stated that he did not intend to account for his use of these funds by providing those receipts, which were requested in discovery, and did not have any desire to provide them to Mrs. Judd. Mr. Guye has sold Company equipment, particularly one tractor, in which he says that he applied the sale price to the outstanding obligation on the Promissory Note owed to his Parents, thus, using a corporate asset to reduce personal liability. Mr. Guye also used [WMDC] work in exchange for a reduction in his other personal debts, including a debt to his mother-in-law.

Mr. Guye has used company credit cards to pay for meals, both for his family and himself, to pay for vacation and travel expenses for personal trips, for the care of his pets, for groceries for himself and his family, for expenses related to his fishing and boating hobby, and incurred numerous

miscellaneous charges for his family and himself. The total for those expenses incurred by Mr. Guye is $239,102.79. This amount includes the credit card charges the he has incurred in the corporate name at First Tennessee . . . in 2014, in the amount of $13,128.16; this amount also includes the American Express charges incurred in 2014 in the amount of $5,288.26, again, in the [WMDC's] name. It also includes [a separate] First Tennessee account . . . in the amount of $7,211.39 for 2013-2014.

Mrs. Judd, upon assuming responsibility for payment of the corporate obligations and for handling of the banking for the Company, requested that her brother, [Mr. Guye], provide her with all the invoices for work done for customers, that he provide her with the payments that he had received from the customers to deposit into the corporate account, and that he cease using the credit cards for personal reasons – all of which were ignored by Mr. Guye. Mrs. Judd also discussed her concerns about the company charges Mr. Guye was incurring with her Parents, who acknowledged that each of the children had benefitted from the acquisition of ownership of the Company, but that they were reluctant to become involved in the dispute.

• • •

In order to attempt to protect the Company assets, Mrs. Judd removed Mr. Guye's privileges for the company credit cards then in existence. She also changed the post office box, or created a new one, and left the old one but changed the street address to the new one. She opened new bank accounts in the name of . . . [WMDC] . . . and attempted to set up independent measures to deposit income from [WMDC] and to make the payments that she was able to make for the obligations of [WDMC]. Mr. Guye, likewise, took action, depositing the checks that he had received from customers into a new bank account on which he was the sole signatory. He locked Mrs. Judd out of the [WMDC] building. He opened two new credit cards for [WMDC] in his name only, and refused to allow Mrs. Judd access to the offices. He also stopped paying her salary of $495 per week. Since September 2012 to November 1, 2014, this amount is $55,440. He refused to provide her with information or documentation concerning the finances of [WMDC], including information about jobs, invoices, receipts, expenses, income, bills, or debts. As to her rights as a shareholder equal to fifty percent (50%) ownership of [WMDC], Mr. Guye completely diverted control of the Company to himself. He concluded that he was accountable to no one.

• • •

- 8 -

The Court concludes that Mr. Guye has operated [WMDC] for his own benefit and that his actions are illegal and constitute a gross abuse of the corporate structure, both for the purpose of evading taxes and to evade responsibility to the other shareholder in the Company, his sister, [Mrs.] Judd. The [parties'] Parents had the stock powers, and they rightfully had the ability to elect Mr. Guye as President of the Corporation; those stock powers allowed them to vote the stock. However, they did not allow anyone holding those stock powers to condone the wrongful use of corporate assets and income such as that perpetrated by Mr. Guye for his personal benefit to the detriment of [WMDC] and to its other shareholder, Mrs. Judd.

The record clearly demonstrates that Mr. Guye has been using corporate assets solely for his own and his family's personal benefit. There has been a total disregard of the corporate structure on the basis that this is the way in which his father operated the Company. The Court does not concur with Mr. Guye's statement that Mr. Guye, Sr. operated the Company in the same manner as Mr. Guye. At the time Mr. Guye, Sr. operated the business as a sole proprietorship, he was entitled to take certain liberties because he was solely responsible for the income and outgo of the company. However, once the Corporation was established, everyone had to comply with the law governing corporations; children cannot be treated differently than any other shareholder. The Court is persuaded that if the [parties'] Parents had sold this business to two independent businessmen, they would not have tolerated a person misusing the Corporation the way Mr. Guye has misused the Corporation.

The Court finds that Mr. Guye was cavalier in his testimony, and finds that Mr. Guye was not a credible witness, and the Court, to a great extent, did not believe his testimony. Although the Court recognizes that Mr. Guye may have occasionally treated his employees to breakfast and occasionally purchased gas on the company credit cards, the Court is convinced, based on the evidenced presented, that Mr. Guye engaged in a pervasive, intentional, and willful ignorance of the corporate form. In short, Mr. Guye treated [WMDC] like a personal checking account, which is not permitted. . . .

For the foregoing reasons, we affirm the trial court's decision to pierce the corporate veil of WMDC in order to hold Defendant personally liable for the corporation's debt to Plaintiff.

II. FRIVOLOUS APPEAL

Plaintiff seeks to recover the attorneys' fees and costs under Tenn. Code Ann. § 27-1-122.

Tenn. Code Ann. § 27-1-122 provides that "[w]hen it appears to any reviewing court that the appeal from any court of record was frivolous or taken solely for delay, the court may, either upon motion of a party or of its own motion, award just damages against the appellant, which may include, but need not be limited to, costs, interest on the judgment, and expenses incurred by the appellee as a result of the appeal." Whether to award attorney's fees on appeal is within this court's sole discretion. *Wills v. City of Memphis*, 457 S.W.3d 30, 51 (Tenn. Ct. App. 2014) (citing *Archer v. Archer*, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995)). When considering a request for attorney's fees, we will consider "the requesting party's ability to pay, the requesting party's success on appeal, whether the appeal was taken in good faith, and any other relevant equitable factors." *Culbertson v. Culbertson*, 455 S.W.3d 107, 158 (Tenn. Ct. App. 2014) (citing *Moran v. Willensky*, 339 S.W.3d 651, 666 (Tenn. Ct. App. 2010)). After considering these factors, we are unable to conclude that this appeal was frivolous or taken solely for delay. Therefore, we deny Plaintiff's request.

## IN CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against the appellant, Carlton Guye.

_____
FRANK G. CLEMENT JR., P.J., M.S.