# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
July 23, 2015 Session

## ROBERT HOWARD LUBELL v. DEBORAH JO LUBELL

**Appeal from the Circuit Court for Bradley County**
**No. V-12-912     J. Michael Sharp, Judge**

---

**No. E2014-01269-COA-R3-CV-FILED-NOVEMBER 12, 2015**

---

This is a divorce action involving a long-term marriage between parties whose primary source of income throughout the marriage was their respective employment by a nonprofit corporation they had co-founded.  The wife alleged that the nonprofit corporation was the husband's alter ego and should therefore be classified as the parties' marital asset.  The trial court found, *inter alia*, that the nonprofit corporation could not be classified or distributed as a marital asset.  The wife appeals this finding, as well as the trial court's (1) capping of the husband's child support obligation in combination with an award to the wife of transitional alimony, (2) denial of her requests for alimony *in futuro* and *in solido,* (3) allocation of certain marital debts to the wife, and (4) inclusion of extraordinary educational expenses in the calculation of the husband's income for child support purposes.  Having determined that the trial court placed an improper cap on child support by linking it to the transitional alimony award and improperly considered extraordinary educational expenses as an adjustment to the husband's gross income rather than as a deviation, we vacate the trial court's determination of the husband's child support obligation.  We remand for recalculation of the husband's child support obligation.  We modify the award of transitional alimony to an award of alimony *in futuro* and separate the amount from the calculation of child support.  Having also determined that the wife is entitled to an award of alimony *in solido* to more equitably adjust the distribution of the marital estate, we reverse the trial court's denial of alimony *in solido* and remand for the trial court to determine the amount to be awarded.  We affirm the trial court's judgment in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Vacated in Part, Reversed in Part, Affirmed in Part as Modified; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., C.J., and D. MICHAEL SWINEY, J., joined.

William J. Brown, Cleveland, Tennessee, for the appellant, Deborah Jo Lubell.

Philip M. Jacobs, Cleveland, Tennessee, for the appellee, Robert Howard Lubell.

Stephen S. Duggins, Chattanooga, Tennessee, for the third-party appellee, Partners for Christian Media, Inc.

**OPINION**

I.  Factual and Procedural History

The parties were originally married in July 1976.  They subsequently divorced in 1988 but began cohabitating approximately a year later and were married a second time in February 1991.  At the time of trial in the instant action, Husband was fifty-eight years old while Wife was fifty-seven years of age.  Their second marriage had lasted twenty-two years, and it had been thirty-seven years since they were first married.  During the marriage at issue in this divorce action, the parties adopted two children:  a son who was fourteen years old and a daughter who was twelve years old at the time of trial.  The son was diagnosed at the age of two with a high-functioning form of autism and Asperger's syndrome.  By the time of trial, he had for several years attended Bachman Academy, a private school designed to meet special needs.  The parties' daughter attended a private Christian school.

The parties founded Partners for Christian Media ("Partners") in 1992.  Husband had been President of Partners since its establishment.  He began his career by completing two and one-half years of coursework toward a bachelor's degree with a major in broadcast journalism at Lee College (now Lee University).  Prior to founding Partners, Husband worked as a sales manager for two radio stations and a marketing manager for a cellular communications company.  He also founded and served as president of two safety product companies and a cellular telephone company.  Since 1992, Partners had been Husband's only source of employment.

In previous years, Wife had held the position in Partners of National Sales Manager.  Partners terminated Wife's employment in December 2012.  Through Partners, Wife had also served as General Manager and Vice President of an affiliate radio station, Friendship Broadcasting ("Friendship"), although it was undisputed that Wife's role in this regard was primarily as a figurehead.  Friendship terminated Wife's employment in January 2013.  Wife holds a bachelor's degree in psychology from Lee College.  At the time of trial, Wife had also completed several courses toward a master's degree in theology by attending the Church of God's Seminary part-time.  Prior to Partners' formation, Wife had held other positions in broadcast advertising sales.  During Partners'

2

early years, Wife had also worked part-time as a river guide to assist with the parties' expenses.

Partners is a nonprofit corporation, registered with the Tennessee Secretary of State and certified by the Internal Revenue Service as a 501(c)(3) organization. It operates a radio station broadcasting Christian content throughout Tennessee and three other states, as well as operating a second radio station through an affiliate. As a nonprofit religious organization, Partners accepts a high number of donations from third parties. In addition, Partners sells some broadcast time and advertising, and it is undisputed that in the organization's early years, Wife was instrumental in securing funding through her efforts as the primary sales representative and business manager. In addition, Wife designed the bookkeeping process used to track donors and their donations.

In 2012, Partners reported a net worth on its federal income tax return of $1,294,816.00. This reflected total revenues of $2,157,980.00 and salary expenses of $1,182,737.00. The trial court found that Husband's income at the time of trial was $190,000.00 per year. Testimony and compensation records also demonstrated that Husband received multiple benefits, including health insurance, disability insurance, a 401(k), a company automobile, and compensation through trade barter.

When Wife was employed by Partners, her income was based on a twenty-percent commission for her sales. Her W-2 forms demonstrate that she earned approximately $60,000 per year from 2002 through 2006. Her salary began to decrease, however, in 2007. By 2009, she earned $39,845.51. At that time, Wife began to work less, and by 2010, she was earning income only from residual accounts she had managed. She earned $22,725.74 in 2010 and $20,682.00 in 2011. Wife's 2012 W-2 reflected income received from Partners in the amount of $42,679.16. According to Partners' Finance Director Linda Yeargan, the $42,679.12 received by Wife in 2012 included $20,000.00 in trade barter. Ms. Yeargan testified that Wife's 2012 income represented commissions owed to Wife from residual accounts, although Wife disputed this explanation and implied that her income was falsely bolstered. Husband testified that Wife suffered from depression and insomnia and simply stopped going to work. Wife insisted, however, that she felt "pushed out" of her position by Husband's hiring of a new sales manager. She acknowledged that she had not worked on any accounts for Partners since 2009.

Wife, acting through her former counsel, first filed a complaint for divorce in the Hamilton County Circuit Court.[1] On December 12, 2012, Husband subsequently commenced the instant action by filing a complaint for divorce in the Bradley County

---

[1] Wife's initial complaint for divorce is not in the record on appeal.

Circuit Court ("trial court"). He alleged irreconcilable differences as a ground for divorce, or in the alternative, inapprorpriate marital conduct on the part of Wife. See Tenn. Code Ann. § 36-4-101(11), (14) (2014). Upon agreement of the parties, the Hamilton County Circuit Court entered an order on March 22, 2013, transferring the Hamilton County action to the trial court and consolidating it with the action commenced by Husband. In the meantime, Wife had filed a motion seeking alimony *pendente lite* and child support on January 23, 2013. The parties had stipulated to attend mediation in an agreed order entered by the trial court on Januay 28, 2013.

On March 7, 2013, Wife, acting through her current counsel, filed an answer to Husband's complaint, a counter-complaint against Husband, and a "Cross Complaint" against Partners. Wife alleged irreconcilable differences as a ground for divorce, or in the alternative, inappropriate marital conduct on the part of Husband. *See id.* In her "Cross Complaint," Wife requested that the trial court classify Partners as a marital asset. Wife also filed amended motions seeking an award of alimony *pendente lite* and entry of a proposed temporary parenting plan.

Partners responded on April 8, 2013, by filing a motion to dismiss what it treated as Wife's "third-party complaint" against it. Wife filed a response to the motion to dismiss on April 25, 2013. Following a hearing conducted on May 8, 2013, the trial court determined that Partners was a legal nonprofit corporation and that as such, its assets could not be included as a marital asset when distributing the parties' marital estate. On August 13, 2013, the trial court entered an order, *inter alia*, granting Partners' motion to dismiss what it found to be Wife's third-party complaint against Partners, pursuant to Tennessee Rule of Civil Procedure 12.02(6). The court also made several findings of fact regarding other issues concerning the divorce.

On August 30, 2013, the court *sua sponte* rescinded the August 13, 2013 order, pursuant to Tennessee Rule of Civil Procedure 60.02, noting that the matter had been before it solely on Partners' motion to dismiss the third-party complaint. The court substituted a new order confirming the dismissal of Wife's complaint against Partners. The trial court subsequently entered an order on September 6, 2013, clarifying its order dismissing Partners and providing for temporary child and spousal support pending trial.

Wife filed a motion for contempt on September 17, 2013, alleging that Husband had paid only half of the approxmately $2,000.00 owed for the first month's child support ordered by the trial court. Husband subsequently filed a response, asserting, *inter alia*, that he was breaking down the child support obligation into twice-monthly payments and that he was also paying many expenses on Wife's behalf. On September 20, 2013, Husband filed motions requesting that the trial court order the marital residence sold and enjoin Wife from extending the rental agreement on the parties' rental property and from

extending the lease on the apartment in which she had been living. Wife subsequently filed a response objecting to Husband's motions.

Following a hearing conducted on September 30, 2013, the trial court denied Wife's motion for contempt and denied Husband's motions to sell the marital residence and to enjoin Wife from renewing the lease on her apartment. The court granted Husband's motion to enjoin Wife from renewing the lease on the rental property. The court entered an order memorializing these decisions on November 5, 2013. Upon Husband's subsequent motion and Wife's response, the court entered an agreed order regarding holiday co-parenting time on November 25, 2013.

The trial court conducted a bench trial spanning the course of two days on December 16 and 18, 2013. Following the trial, Wife filed a motion in January 2014, seeking attorney's fees and costs. Husband filed a motion requesting that the court direct Wife to amend her federal tax return. On March 7, 2014, the trial court entered a "Final Order," incorporating its findings of fact and conclusions of law as a memorandum opinion. The court took judicial notice of its September 6, 2013 order dismissing Partners from the case and concluded that all issues regarding Partners had been resolved by that order. The court then approved the parties' agreed permanent parenting plan, distributed the marital estate, and awarded transitional alimony to Wife for a period of ten years in incrementally decreasing amounts. The court directed that for the first six years following the final judgment, the amount of transitional alimony would be inclusive of child support so that Wife would receive the following: $2,750.00 monthly combined alimony and child support for three years, followed by $2,000.00 monthly combined alimony and child support for three years, followed by $1,750.00 monthly alimony for two years, followed by $1,000.00 monthly alimony for two years.

Each party respectively filed a motion to alter or amend the judgment. The parties also filed various other motions not relevant to this appeal. Wife noted in her motion to alter or amend that, *inter alia*, no income shares worksheet for child support calculation had been filed with the final order. Following a hearing conducted on March 18, 2014, the trial court entered an order on March 26, 2014, denying all motions to alter or amend the judgment, resolving issues raised by the parties' other motions, and setting a schedule for child support payments. In calculating child support, the court adopted Husband's proposed income shares worksheet, which included an adjustment to Husband's income for payment of private school tuition for the parties' son. In response to subsequent post-judgment motions, the trial court entered a revised final order on June 9, 2014,

5

modifying, *inter alia*, the distribution of marital property.  Wife timely appealed on July 7, 2014.[2]

## II.  Issues Presented

Wife presents three issues on appeal, which we have restated as follows:

1.      Whether the trial court erred by dismissing Partners from this action and declining to consider the nonprofit corporation as a marital asset.

2.      Whether the trial court erred in the type, duration, and amount of alimony awarded to Wife, particularly by (a) awarding Wife transitional alimony rather than alimony *in futuro*, (b) capping Husband's child support obligation in combination with the award of transitional alimony, (c) declining to award Wife alimony *in solido*, and (d) allocating certain marital debts to Wife.

3.      Whether the trial court erred in calculating child support on the income shares worksheet by including extraordinary educational expenses for the parties' son as an adjustment to Husband's income rather than a deviation from the base child support amount.

## III.  Standard of Review

In a case involving the proper classification and distribution of assets incident to a divorce, our Supreme Court has elucidated the applicable standard of appellate review as follows:

This Court gives great weight to the decisions of the trial court in dividing marital assets and "we are disinclined to disturb the trial court's decision unless the distribution lacks proper evidentiary support or results in some error of law or misapplication of statutory requirements and procedures." *Herrera v. Herrera*, 944 S.W.2d 379, 389 (Tenn. Ct. App. 1996).  As such, when dealing with the trial court's findings of fact, we review the record de novo with a presumption of correctness, and we must honor those findings unless there is evidence which preponderates to the contrary.  Tenn. R. App. P. 13(d); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993).  Because trial courts are in a far better position than this

_____

[2] Upon Husband's and Partners' joint motion to dismiss the appeal as untimely, this Court entered an order on December 6, 2014, denying the motion and concluding that the June 9, 2014 order was a final judgment pursuant to Tennessee Rule of Appellate Procedure 3(a).

Court to observe the demeanor of the witnesses, the weight, faith, and credit to be given witnesses' testimony lies in the first instance with the trial court. *Roberts v. Roberts*, 827 S.W.2d 788, 795 (Tenn. Ct. App. 1991). Consequently, where issues of credibility and weight of testimony are involved, this Court will accord considerable deference to the trial court's factual findings. *In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007) (citing *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999)). The trial court's conclusions of law, however, are accorded no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 744-45 (Tenn. 2002).

*Keyt v. Keyt*, 244 S.W.3d 321, 327 (Tenn. 2007). Questions relating to the classification of assets as marital or separate are questions of fact. *Bilyeu v. Bilyeu*, 196 S.W.3d 131, 135 (Tenn. Ct. App. 2005).

Further, as this Court has previously held:

Because Tennessee is a "dual property" state, a trial court must identify all of the assets possessed by the divorcing parties as either separate property or marital property before equitably dividing the marital estate. Separate property is not subject to division. In contrast, Tenn. Code Ann. § 36-4-121(c) outlines the relevant factors that a court must consider when equitably dividing the marital property without regard to fault on the part of either party. An equitable division of marital property is not necessarily an equal division, and § 36-4-121(a)(1) only requires an *equitable* division.

*McHugh v. McHugh*, No. E2009-01391-COA-R3-CV, 2010 WL 1526140 at *3-4 (Tenn. Ct. App. Apr. 16, 2010) (internal citations omitted) (emphasis in original). *See also Manis v. Manis*, 49 S.W.3d 295, 306 (Tenn. Ct. App. 2001) (holding that appellate courts reviewing a distribution of marital property "ordinarily defer to the trial judge's decision unless it is inconsistent with the factors in Tenn. Code Ann. § 36-4-121(c) or is not supported by a preponderance of the evidence.").

Regarding alimony, our Supreme Court has "repeatedly and recently observ[ed] that trial courts have broad discretion to determine whether spousal support is needed and, if so, the nature, amount, and duration of the award." *See Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011). The Court has further explained:

[A] trial court's decision regarding spousal support is factually driven and involves the careful balancing of many factors. As a result, "[a]ppellate courts are generally disinclined to second-guess a trial judge's spousal

support decision." *Kinard*, 986 S.W.2d at 234. Rather, "[t]he role of an appellate court in reviewing an award of spousal support is to determine whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable." *Broadbent v. Broadbent*, 211 S.W.3d 216, 220 (Tenn. 2006). Appellate courts decline to second-guess a trial court's decision absent an abuse of discretion. An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice. This standard does not permit an appellate court to substitute its judgment for that of the trial court, but "'reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives,' and thus 'envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal.'" *Henderson*, 318 S.W.3d at 335 (quoting *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)). Consequently, when reviewing a discretionary decision by the trial court, such as an alimony determination, the appellate court should presume that the decision is correct and should review the evidence in the light most favorable to the decision.

*Id*. at 105-06 (other internal citations omitted).

This Court has described the proper standard of review for child support determinations as follows:

Prior to the adoption of the Child Support Guidelines, trial courts had wide discretion in matters relating to child custody and support. *Hopkins v. Hopkins*, 152 S.W.3d 447, 452 (Tenn. 2004) (Barker, J., dissenting). Their discretion was guided only by broad equitable principles and rules which took into consideration the condition and means of each parent. *Brooks v. Brooks*, 166 Tenn. 255, 257, 61 S.W.2d 654, 654 (1933). However, the adoption of the Child Support Guidelines has limited the courts' discretion substantially, and decisions regarding child support must be made within the strictures of the Child Support Guidelines. *Berryhill v. Rhodes*, 21 S.W.3d 188, 193 (Tenn. 2000); *Jones v. Jones*, 930 S.W.2d 541, 545 (Tenn. 1996); *Smith v. Smith*, 165 S.W.3d 279, 282 (Tenn. Ct. App. 2004).

* * *

8

Because child support decisions retain an element of discretion, we review them using the deferential "abuse of discretion" standard. This standard is a review-constraining standard of review that calls for less intense appellate review and, therefore, less likelihood that the trial court's decision will be reversed. *State ex rel. Jones v. Looper*, 86 S.W.3d 189, 193 (Tenn. Ct. App. 2000); *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 222-23 (Tenn. Ct. App. 1999). Appellate courts do not have the latitude to substitute their discretion for that of the trial court. *Henry v. Goins*, 104 S.W.3d 475, 479 (Tenn. 2003); *State ex rel. Vaughn v. Kaatrude*, 21 S.W.3d 244, 248 (Tenn. Ct. App. 2000). Thus, a trial court's discretionary decision will be upheld as long as it is not clearly unreasonable, *Bogan v. Bogan*, 60 S.W.3d 721, 733 (Tenn. 2001), and reasonable minds can disagree about its correctness. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001); *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000). Discretionary decisions must, however, take the applicable law and the relevant facts into account. *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996). Accordingly, a trial court will be found to have "abused its discretion" when it applies an incorrect legal standard, reaches a decision that is illogical, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party. *Perry v. Perry*, 114 S.W.3d 465, 467 (Tenn. 2003); *Clinard v. Blackwood*, 46 S.W.3d 177, 182 (Tenn. 2001); *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 709 (Tenn. Ct. App. 1999).

*Richardson v. Spanos*, 189 S.W.3d 720, 725 (Tenn. Ct. App. 2005).

## IV. Nonprofit Organization Not a Marital Asset

Wife contends that the trial court erred by dismissing Partners from this action and by finding that the value of Partners should not be included within the marital estate due to its status as a nonprofit corporation. Husband asserts that the trial court properly dismissed Partners from the lawsuit and properly declined to consider Partners as part of the marital estate due to its nonprofit status. Partners has filed a responsive brief on appeal and likewise argues that the trial court properly dismissed it as a third party and declined to consider it a marital asset. Upon our thorough review, we agree with Husband and Partners on this issue.

### A. Dismissal of Third-Party Complaint

Wife contends that when the trial court considered Partners' motion to dismiss the third-party complaint against it, the court erred by failing to apply the standard

appropriate to a Tennessee Rule of Civil Procedure 12.02(6) motion in that the court did not treat all statements made in the complaint as true. *See Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 696 (Tenn. 2002). ("In reviewing a motion to dismiss, the appellate court must construe the complaint liberally, presuming all factual allegations to be true and giving the plaintiff the benefit of all reasonable inferences."). In her "Cross Complaint" against Partners, Wife alleged, *inter alia*, that (1) she and Husband co-founded Partners, (2) Partners had been their exclusive source of income, (3) the purpose of the nonprofit designation was so that the parties could solicit tax-free contributions to increase Partners' assets, (4) Partners was Husband's alter ego, and (5) Husband operated Partners as though it were his personal property with the purpose of increasing his personal wealth.

As Husband notes, Wife made the same allegations regarding Partners in her complaint against Husband. In dismissing Partners as a party to this action, the trial court found that Partners was a legal nonprofit corporation under Tennessee law and that it therefore could not be subject to distribution as a marital asset of the parties. The court also found that Wife's allegations did not constitute a claim that Partners, as an entity, had caused Wife an injury. We conclude that the trial court properly considered Wife's allegations in determining that even if those allegations proved true, Wife had failed to state a claim against Partners upon which she could be granted relief. The court therefore did not err in dismissing Partners as a party.

### B. Exclusion of Partners from Marital Estate

The general focus of Wife's issue on appeal regarding Partners is that the trial court erred by excluding the nonprofit organization's value from the classification, valuation, and distribution of the marital estate. Specifically, Wife posits that Partners functions as Husband's alter ego and that equity considerations merit piercing the corporate veil to assess Husband's interest in Partners as marital property. Upon careful consideration of the record and applicable law, we conclude that the evidence preponderates in favor of the trial court's finding that Partners cannot be considered a marital asset of the parties.

It is undisputed that the parties formed Partners in 1992 as a nonprofit corporation pursuant to the Tennessee Nonprofit Corporation Act. *See* Tenn. Code Ann. §§ 48-51-101, *et seq.* (2012 & Supp. 2015). Partners is a public benefit corporation pursuant to Tennessee Code Annotated § 48-52-102(a) (Supp. 2015). Since its inception, Partners has maintained tax exempt status as a charitable organization under section 501(c)(3) of the Internal Revenue Code of 1986. *See* 26 U.S.C. § 501(c)(3). Section 501(c)(3) exempts from taxation "[c]orporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public

safety, literary, or educational purposes . . . ." It also requires that "no part of the net earnings of [the exempt organization] inures to the benefit of any private shareholder or individual." *See also Summers v. Cherokee Children & Family Servs., Inc.*, 112 S.W.3d 486, 500 (Tenn. Ct. App. 2002). Federal regulations interpreting § 501(c)(3) emphasize the prohibition on distribution of net earnings to individuals:

> An organization is not organized or operated exclusively for one or more [charitable purposes] unless it serves a public rather than a private interest. Thus, to meet the requirement of this subdivision, it is necessary for an organization to establish that it is not organized or operated for the benefit of private interests such as designated individuals, the creator or his family, shareholders of the organization, or persons controlled, directly or indirectly, by such private interests.

Treas. Reg. § 1.501(c)(3)–1(d)(1)(ii).

The Tennessee Nonprofit Corporation Act also precludes distribution of a nonprofit corporation's assets to any private individual. As this Court explained in *Cherokee Children*:

> This prohibition on distribution of corporate assets or earnings to those operating a nonprofit corporation has been reinforced by specific statutory provisions. Under Tenn. Code Ann. § 48-63-101 a nonprofit corporation may make no distributions that are not authorized by Tenn. Code Ann. § 48-63-102. That section provides that a public benefit corporation may make distributions to its members: (1) who are public benefit corporations; and (2) if in conformity with its charitable purposes. Tenn. Code Ann. § 48-64-102(b).[3] "Distribution" is defined as "the direct or indirect transfer of assets or any part of the income or profit of a corporation, to its members, directors, or officers." Tenn. Code Ann. § 48-51-201[13]. Thus, in combination, these statutes clearly prohibit the transfer of assets, income, or accumulated revenue to any individual who is a member, director, or officer of the corporation. The statutory exception to that prohibition is found in the definition "distribution."

---

[3] Effective January 1, 2015, after the filing of the complaint in the instant case, the Tennessee General Assembly amended Tennessee Code Annotated § 48-63-102(b) to read: "A public benefit corporation may make distributions to its members who are public benefit corporations if the distributions are in conformity with its charitable purposes." *See* 2014 Pub. Acts ch. 899, § 97.

"Distribution" does not include:

(A) The payment of compensation in a reasonable amount to its members, directors, or officers for services rendered;

(B) Conferring benefits on its members in conformity with its purposes;

(C) Repayment of debt obligations in the normal and ordinary course of conducting business activities; or

(D) The incurrence of indebtedness, whether directly or indirectly (including through a guaranty), for or on behalf of a member, director or officer.

*Id.*[4]

In addition to these limitations on distributions, nonprofit corporations are specifically prohibited from lending money to, or guaranteeing the obligation of, a director or officer of the corporation. Tenn. Code Ann. § 48-58-303.

*Cherokee Children*, 112 S.W.3d at 501-02.

Referencing, *inter alia*, *Cherokee Children*, the trial court concluded that according to Tennessee law, Partners, as a registered nonprofit corporation, could not belong to an individual or individuals and therefore could not be considered marital property. *See also State ex rel. Little People's Child Dev. Ctr., Inc. v. Little People's Child Dev. Ctr., Inc.*, No. M2007-00345-COA-R3-CV, 2009 WL 103509 at *8 (Tenn. Ct. App. Jan. 9, 2009) ("[A]ssets belonging to the nonprofit corporation must be used only for the public benefit purposes."). Wife asserts, however, that Partners is actually the alter ego of Husband and that Partners' identity as a nonprofit entity should be "pierced"

---

[4] Effective January 1, 2015, after the commencement of this action, the Tennessee General Assembly amended the definition of "Distribution" provided by Tennessee Code Annotated § 48-51-201 to insert "and the reimbursement of reasonable expenses" in (A), substitute paired commas for the parentheses enclosing the phrase, "including through a guaranty," in (D), and add two additional exceptions: "(E) A sale on credit in the ordinary course of business or a life insurance policy loan; or (F) Any item in § 48-58-303(c)." *See* 2014 Pub. Acts ch. 60, § 8. In the 2015 version, the definition of "Distribution" is number (13) within section -201. *See id.*

in order to allow consideration of Husband's interest in Partners when distributing the marital estate. We disagree.

Generally, a shareholder of a corporation is treated as a separate entity from the corporation itself and is not personally liable for the corporation's actions. *See Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 214 (Tenn. 2012). The doctrine of piercing the corporate veil, however, provides that "in appropriate circumstances . . . the corporate veil may be pierced and the acts of a corporation attributed to a shareholder." *Id.* ("'The corporate entity generally is disregarded where it is used as a cloak or cover for fraud or illegality, to work an injustice, to defend crime, or to defeat an overriding public policy, or where necessary to achieve equity.'") (quoting Am. Jur. 2d *Corporations* § 57 (2004)). Regarding the applicable factors to be considered, our Supreme Court has explained:

> When determining whether the corporate veil should be pierced, the following factors are applicable:
>
>> Factors to be considered in determining whether to disregard the corporate veil include not only whether the entity has been used to work a fraud or injustice in contravention of public policy, but also: (1) whether there was a failure to collect paid in capital; (2) whether the corporation was grossly undercapitalized; (3) the nonissuance of stock certificates; (4) the sole ownership of stock by one individual; (5) the use of the same office or business location; (6) the employment of the same employees or attorneys; (7) the use of the corporation as an instrumentality or business conduit for an individual or another corporation; (8) the diversion of corporate assets by or to a stockholder or other entity to the detriment of creditors, or the manipulation of assets and liabilities in another; (9) the use of the corporation as a subterfuge in illegal transactions; (10) the formation and use of the corporation to transfer to it the existing liability of another person or entity; and (11) the failure to maintain arms length relationships among related entities.
>
> [*CAO Holdings, Inc. v.*] *Trost,* 333 S.W.3d [73,] 88 n.13 [(Tenn. 2010)] (quoting *FDIC v. Allen,* 584 F. Supp. 386, 397 (E.D. Tenn. 1984)). No single factor among those listed is conclusive, nor is it required that all of these factors support piercing the corporate veil; typically, courts will rely on a combination of the factors in deciding the issue. [*The Oceanics Schs., Inc. v.*] *Barbour,* 112 S.W.3d [135,] 140 [(Tenn. Ct. App. 2003)].

However, in all events, the equities must "substantially favor" the party requesting relief, *Trost,* 333 S.W.3d at 89, and the presumption of the corporation's separate identity should be set aside only "with great caution and not precipitately." *Schlater* [*v. Haynie*]*,* 833 S.W.2d [919,] 925 [(Tenn. Ct. App. 1991)].

*Rogers*, 367 S.W.3d at 215.

In its March 7, 2014 order, the trial court adopted its previous findings made regarding Partners in the order entered August 30, 2013. These specific findings were as follows in relevant part:

> The Court notes that [Wife's] third-party complaint against Partners for Christian Media, Inc. is essentially her request to pierce the corporate veil and to declare the assets of the corporation to be part of the marital estate, therefore subject to equitable division in this divorce proceeding. The third-party complaint alleges that [Husband] is the president of the non-profit corporation. The third-party complaint further alleges that the corporation has a separate Board of Directors and that the selection of the Board of Directors was and is made by [Husband]. The third-party complaint also alleges that the corporation "is a Public Non-Profit Corporation founded under the laws of the State of Tennessee" with a registered agent and business address in East Ridge, Tennessee.

> * * *

> [Wife] alleges that she and her husband founded Partners for Christian Radio Media, Inc. in 1992, and that the organization was primarily funded at that time from [Wife's] services as the business manager and primary sales representative. The Court takes judicial notice of the fact that [Wife] herself alleges that Partners for Christian Media, Inc. is in fact a non-profit corporation. In paragraph 5 of her third-party complaint, [Wife] notes that Partners for Christian Media, Inc. was the exclusive source of income for both she and [Husband]. The third-party complaint also refers to distributions being made to [Husband and Wife] from the organization's revenues. However, the third-party complaint does not define what was meant by distributions. The Court must assume the allegation was referring to something other than her regular income, however, there was no specific allegation as to what was meant by the term "distribution."

14

This Court concludes pursuant to T.C.A. §48-51-201(12)(A) that non-profit corporations are allowed to provide reasonable compensation to their employees. The third-party complaint does not contain any specific allegations of wrongdoing but does allege that the corporation was created "for the purpose of permitting the company to accept tax free contributions to the corporation and accept tax deductible contributions from individuals all for the purpose of increasing the assets of the corporation for Robert Lubell's personal gain." While the Court recognizes that the corporation was in fact incorporated as a non-profit corporation, the fact that this corporation was formed with an expectation that it would have tax exempt status does not in any way prove that there has been any impropriety that in some way has negatively affected [Wife] giving her a cause of action against the corporation. The third-party complaint alleges that [Wife] acted as a business manager and sales representative for the corporation, and does not allege a failure to pay for her efforts and activities on behalf of the corporation. The third-party complaint does not allege that the corporation has done her wrong or has caused her any harm.

* * *

The third-party complaint alleges that Partners for Christian Media, Inc. was formed as a non-profit corporation under the State of Tennessee and implicitly alleges that such non-profit corporation is still alive. There is no allegation suggesting a lack of an appropriate charter and/or other appropriate paperwork being filed with the Secretary of State for the State of Tennessee, and the third-party complaint indicates that the corporation remains a legal non-profit corporation in the State of Tennessee. In Tennessee, the Secretary of State's filing of the charter is conclusive proof that the incorporator satisfied all conditions precedent to incorporation, except in the proceedings by the State . . . *See T.C.A. §48-52-103(b)*. Thus, from the moment the Secretary of State recognizes an organization as a non-profit corporation, it remains a non-profit corporation until dissolved. *See* [*Summers v.*] *Estate of Ford* [146 S.W.3d] *at 570 and 571* [(Tenn. Ct. App. 2004)]. As noted above, upon dissolution, a non-profit corporation's assets must be distributed to another non-profit corporation, not to individuals. Based on all of the above, the Court concludes that [Wife's] request that the assets of Partners for Christian Media, Inc. be declared marital assets, and thus subject to equitable division as part of the marital estate, is not well taken.

The trial court therefore concluded that Wife failed to allege facts that would support a finding that Partners was not a legitimate nonprofit corporation. Because nonprofit corporations in Tennessee are statutorily prohibited from distributing corporate assets or earnings to those operating the corporation, the court determined that Partners could not be considered a marital asset subject to distribution. *See* Tenn. Code Ann. §§ 48-63-101, -102; *Cherokee Children*, 112 S.W.3d at 501-02.

Having reached this determination, the trial court did not further engage in a piercing-the-veil analysis pursuant to the *Allen* factors. Upon our careful review, we determine that Wife's allegations do not address the majority of the *Allen* factors. In particular, Wife does not allege that Partners "has been used to work a fraud or injustice in contravention of public policy . . . ." *See Allen*, 584 F. Supp. at 397. In addition, Wife does not allege a failure to collect capital (factor 1), gross undercapitalization (factor 2), use of the same office or business location (factor 5), employment of the same employees or attorneys (factor 6), use of the corporation as a subterfuge in illegal transactions (factor 9), use of the corporation to transfer existing liability (factor 10), or failure to maintain arm's length relationships among related entities (factor 11). *See id.* Factors (3) (nonissuance of stock certificates) and (4) (sole ownership of stock) are inapplicable to a nonprofit corporation in that no individuals may hold shares. *See id.*, Tenn. Code Ann. § 48-53-103(b) (2012); Tenn. Code Ann. §§ 48-63-101, -102 (2012 & Supp. 2015). Wife's allegations regarding Husband as Partners' alter ego could, *arguendo*, implicate the remaining factors: use of the corporation as an instrumentality of an individual (factor 7) and diversion of corporate assets to a stockholder (or in this case, officer) to the detriment of creditors (factor 8). *See Allen*, 584 F. Supp. at 397. However, as the trial court found, Wife's allegations in the complaint were not specific regarding any "distributions" made by Partners to Husband or to Wife other than compensation and benefits provided to them as employees. Specifically as to factor 8, Wife alleged no detriment to Partners' creditors as a result of any funds paid to Husband.

Testimony and compensation records demonstrated that the benefits provided to Husband by Partners included health insurance, disability insurance, a 401(k), a company automobile, and compensation through trade barter. Wife had also in previous years been provided with trade barter and a company automobile. Following the termination of Wife's employment with Partners, Husband entered an agreement to purchase the company automobile Wife had been driving. Husband continued to make payments on the debt associated with Wife's automobile at the time of trial and was ordered by the court to continue doing so until the debt was satisfied. Husband also continued to utilize an automobile provided to him by Partners.

Regarding the use of trade barter, Ms. Yeargan testified that Partners provided employees with some compensation through two types of barter. One type was offered

through two barter-trade banks that "barter with all kinds of companies and then [Partners] barter[s] with them for whatever services they have." The second type of barter involved "direct trade," in which companies seeking radio advertising bartered their services with Partners. According to Husband's most recent compensation agreement, he earned $179,000.00 in salary augmented by $20,000.00 in trade barter. As Ms. Yeargan also testified, Husband's compensation records indicated that he was taxed on his trade-barter income as well as his salary.

Wife asserted that Husband was able to obtain funds from Partners whenever he so needed. In support of her assertion, she presented copies of non-payroll checks, dated between November 2008 and June 2012, which were written to Husband on Partners' account and signed by Husband. Ms. Yeargan and Husband respectively testified that these checks represented "advance repayment" of accrued compensation that Husband had previously earned and elected not to collect. According to Ms. Yeargan, if Husband "didn't take his [accrued compensation] in past years, he did not take what he was authorized to take under pay, then he has the ability to take that whenever he needs it . . . ." She further testified that any such advance repayment was accounted for on Husband's pay stubs. Husband testified that he collected no advance repayments in 2013 and that he no longer had a balance of accrued compensation.

Wife also questioned why Husband's trade-barter income had risen above the contracted $20,000.00 in 2013. Ms. Yeargan explained that a new staff member had not realized in 2012 that private school tuition fees for Husband's children needed to be charged to Husband's barter balance. According to Ms. Yeargan and Husband, the additional 2012 barter income was then reflected in his 2013 taxable barter income. We conclude that the evidence does not preponderate against the trial court's finding that Husband was compensated by Partners as allowed by the Tennessee Nonprofit Corporation Act. *See* Tenn. Code Ann. § 48-51-201(13) (Supp. 2015); *Cherokee Children*, 112 S.W.3d at 501-02.

In support of her argument that Partners should be classified as a marital asset, Wife relies on a Nebraska Supreme Court decision in which that court applied an "alter ego" doctrine to a divorce action in which the husband was the president of a nonprofit religious corporation, "Union Oaks." *See Medlock v. Medlock*, 642 N.W.2d 113 (Neb. 2002). The Nebraska court held that equity demanded the inclusion of the nonprofit corporation's assets in the distribution of the parties' marital estate. *See id.* at 125-28. The *Medlock* court determined, *inter alia*, that "[t]he record show[ed] a nearly complete unity of interest between [the husband] and Union Oaks," that the husband "made extensive personal use of corporate funds and assets . . . and carried on personal dealings in the name of the corporation." *Id.* at 125. The court explained that the parties owned no personal property in their own names because "all the property that would ordinarily

have been acquired over the course of a 28-year marriage was instead acquired in the name of Union Oaks." *Id.* In addition, Union Oaks had not been financed by third-party donations but had primarily multiplied its assets through commercial real estate dealings. *Id.* at 682 ("If Union Oaks had been financed by donations from third parties, intended to support religious activities, the equities of this situation would be far different.").

Wife cites two additional cases from other jurisdictions in which the courts found that summary judgment was not warranted regarding the possible inclusion of a nonprofit corporation in the distribution of marital property. *See Barineau v. Barineau*, 662 So.2d 1008 (Fl. Ct. App. 1995) (intermediate appellate decision); *CH v. RH*, 18 Misc. 3d 268 (N.Y. Sup. Ct. Nov. 13, 2007) (trial court decision). Wife also relies heavily on a law review article cited with approval in *Medlock*: Evelyn Alicia Lewis, *When Entrepreneurs of Commercial Nonprofits Divorce: Is it Anybody's Business? A Perspective on Individual Property Rights in Nonprofits*, 73 N.C.L. Rev. 1761 (June 1995).

These authorities upon which Wife relies do not constitute controlling authority for Tennessee courts. *See, e.g.*, *Culbreath v. First Tenn. Bank Nat'l Assoc.*, 44 S.W.3d 518, 526-27 (Tenn. 2001) (determining that cases from other jurisdictions and law review articles cited by the appellee were inapposite where other authorities controlled); *Brooks Cotton Co., Inc. v. Williams*, 381 S.W.3d 414, 422 (Tenn. Ct. App. 2012) (consulting a treatise on contract law and an Alabama Supreme Court decision as persuasive but not controlling authority). We also determine that the instant action is highly factually distinguishable from the Nebraska high court's decision in *Medlock*. In the instant action, it is undisputed that Husband's pay rate is set by Partners' Board of Directors ("the Board"). Wife argues that the Board would provide Husband with whatever amount of money he requested. Testimony indicated, however, that the Board had used guidelines to establish Husband's salary, first by comparing compensation rates at other radio stations in similar markets and later by following pay guidelines recommended by the Evangelical Council for Financial Accountability. Moreover, unlike the nonprofit corporation in *Medlock*, Partners has been financed in significant part through donations from the public. The trial court did not err in determining that Partners' status as a nonprofit corporation prohibited its classification or distribution as a marital asset.

## V. Spousal Support

Wife contends that the trial court erred in the type, duration, and amount of spousal support awarded to her. The trial court awarded Wife transitional alimony spanning the course of ten years and setting the amounts during the first six years to be inclusive of child support. The court thereby set transitional alimony in decreasing increments as follows:

- three years – combination of monthly alimony and child support:   $2,750.00
- three years – combination of monthly alimony and child support:    2,000.00
- two years – monthly alimony:                                       1,750.00
- two years – monthly alimony:                                       1,000.00

Wife asserts that the trial court erred by (a) awarding to Wife transitional alimony rather than alimony *in futuro*, (b) capping the amount of child support to be paid to Wife in combination with the alimony award, (c) declining to award Wife alimony *in solido*, and (d) declining to require Husband to pay certain disputed debts. We will address each of Wife's arguments regarding spousal support in turn.

## A. Type and Duration of Alimony

Tennessee law recognizes four types of spousal support: (1) alimony *in futuro*, also known as periodic alimony; (2) alimony *in solido*, also known as lump-sum alimony; (3) rehabilitative alimony; and (4) transitional alimony. Tenn. Code Ann. § 36-5-121(d) (2014); *Mayfield*, 395 S.W.3d at 115. Our statutory scheme indicates a legislative preference favoring the short-term forms of spousal support, rehabilitative and transitional alimony, over the long-term types of support, alimony *in futuro* and alimony *in solido*. *See* Tenn. Code Ann. § 36-5-121(d)(2)-(3); *Mayfield*, 395 S.W.3d at 115; *Riggs v. Riggs*, 250 S.W.3d 453, 456 (Tenn. Ct. App. 2007).

It is well settled that "trial courts in Tennessee have broad discretion to determine whether spousal support is needed and, if so, to determine the nature, amount, and duration of the award." *Mayfield*, 395 S.W.3d at 114; *see also Fickle v. Fickle*, 287 S.W.3d 723, 736 (Tenn. Ct. App. 2008). Tennessee Code Annotated § 36-5-121(i) (2014) provides that when determining the nature and amount of an alimony award, the trial court should consider all relevant factors, including:

> (1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

> (2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;

> (3) The duration of the marriage;

> (4) The age and mental condition of each party;

19

(5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;

(7) The separate assets of each party, both real and personal, tangible and intangible;

(8) The provisions made with regard to the marital property, as defined in § 36-4-121;

(9) The standard of living of the parties established during the marriage;

(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

"Although each of these factors must be considered when relevant to the parties' circumstances, 'the two that are considered the most important are the disadvantaged spouse's need and the obligor spouse's ability to pay.'" *Gonsewski*, 350 S.W.3d at 110 (quoting *Riggs*, 250 S.W.3d at 457).

In its March 7, 2014 order, the trial court made the following factual findings regarding the statutory alimony factors in pertinent part:

With regard to factor #1, the court finds that both of these parties have the requisite physical and mental health to continue to work and to earn an income for the next several years, based upon the current facts in evidence. The court finds that both parties are still relatively young. [Husband] is in good health, and in the court['s] opinion will likely enjoy

20

many more years of health and the ability to work and make an excellent income in the future. This is based upon the current evidence before this court. On the other hand, [Wife] is also relatively young, and she has excellent training, based upon her college degree, and based upon her prior work experience. The court also takes judicial notice of the fact that [Wife] is about halfway or possibly a little over halfway through her graduate seminary training in the process of obtaining a graduate seminary degree. The court has no way of knowing when or if she will complete the graduate training. However, the court is cognizant of the fact that [Wife] is highly intelligent, is fluent in several languages, and has an excellent past employment resume. However, the court is also cognizant of the fact that [Wife] has experienced some health problems. . . . The court heard the testimony of several witnesses, all who testified that [Wife] was an excellent mother, interacted well with her fellow students, and functioned well both early in the day as well as all throughout the day. The court also observed [Wife] in court on numerous occasions, and finds her to be in excellent health, both physically and mentally.

There is no [question] that there has been a great disparity between what the parties have earned, based upon the past history of [Husband and Wife]. The court finds that [Husband] has earned in excess of $150,000.00 for the last several years. The court takes judicial notice of the fact that [Husband] has earned in excess of $175,000.00 in the most recent years. On the other hand, the court takes judicial notice of the fact that in the last ten years, the most that [Wife] ever earned was about $70,000.00 (see trial exhibit #13 for the year 2005). The court also takes judicial notice of the fact that for the previous three years, [Wife's] earnings have averaged about $28,000.00 per year. Furthermore, the court finds that [Wife's] current income is only about $21,000.00 per year. The court finds that it is highly likely that [Husband's] earning capacity and financial resources will continue at the same or greater rate for the next several years, based upon his earnings history and all of the evidence before the court.

The court finds that [Wife's] earning capacity and financial resources are likely to improve from the current level of income. However, the court finds that [Wife's] earning capacity and financial resources are greatly inferior to [Husband's], given the current facts and evidence before the court.

With regard to factor #2, the court finds that both parties have extensive training and/or education, and furthermore, that both parties have

21

excellent abilities and skills to continue in the work force into the future. As noted above, [Wife] is in the process of furthering her education, which should hopefully broaden her scope for potential employers.

With regard to factors #3, #4 and #5, the duration of this marriage as well as the age and mental condition of each party, the court has already found that this is a marriage of long duration, and the court has already made findings regarding the age, mental and physical condition of both parties.

With regard to factor #6, the court finds that both of these parties have worked outside the home during a great part of this marriage, and it is the court's belief that both parties will continue to be able to work outside the home going forward. However, the court also recognizes that the parties have minor children, and therefore that will cause some limitation pertaining to child care and/or child related responsibilities and needs.

With regard to factors #7 and #8, the court has made an equitable division of the partie[s'] marital estate, and has essentially split the equities of the partie[s'] assets equally, therefore enabling both parties to begin their single lives in an essentially equal position as it relates to cash assets.

With regard to factor #9, the court finds that these parties have enjoyed a very high standard of living during the course of this marriage. . . . The court finds now that [Husband] shows his total expenses at $10,095.00 per month, while [Wife] shows her total monthly expenses at $8,137.00 per month. Thus, the parties now show, based upon their sworn exhibits . . . monthly expenses of over $18,000.00. This is compared to a net monthly income of somewhere between $11,000.00 and $12,000.00 per month. Therefore, the court takes judicial notice of the fact that there is a deficit of more than $6,000.00 per month expenses over income. This is based upon the partie[s'] sworn testimony, and given their exhibits entered with the court. The court finds that there is no way that either of the parties can continue on with their past standard of living nor their current monthly expenses, based upon their current monthly incomes and/or expected future incomes. . . . [T]he court has analyzed the partie[s'] statements, and the court finds realistically that [Wife's] realistic monthly expenses are in an approximate amount of between $4,000.00-$4,250.00 per month, while [Husband's] realistic monthly expenses, including expected child support payments, payment for the Bachman Academy tuition, the children's medical insurance and out of pocket medical expenses, as well as his

22

continued payment for [Wife's] car payment, are in the approximate amount of $5,000.00-$5,250.00 per month. Obviously, the court has made substantial deletions or eliminations of some of the items shown on the partie[s'] income and expense statements. This has been done out of necessity and in the effort to craft a more realistic budget going forward. The court wishes to point out that the court has totally eliminated monthly credit card payments on both [Husband's and Wife's] monthly expenditures by means of the suggestion that both [Husband] and [Wife] pay off all outstanding credit cards out of the equity being received from the sale of their homes. Furthermore, the court has eliminated certain other monthly expenses from both [Husband's and Wife's] current monthly income and expense statements for items such as charitable contributions, pet care, vet bills, and other non-essential expenses. Furthermore, the court has based its findings and numerical calculations, assuming that both parties' monthly rental figure would be $1,000.00 per month, and both parties' utilities and house-hold related expenses including groceries would be equal. The court is also requiring [Husband] to pay the children's out of pocket medical expenses, which shall be included as a part of his child support obligation on an as needed basis. Ultimately, the court understands that the parties are free to use the equity from the sale of their two homes for whatever items they choose. The parties must decide what expenses they deem most important to themselves individually, such as pets and charitable contributions. The court is simply making the effort, and the financial provision, to allow these parties to live reasonably based on a realistic monthly income figure going forward. The court recognizes that the parties are free to choose to do as they deem appropriate.

With regard to factor #10, the court finds that both parties have made tangible and intangible contributions to this marriage, both monetary and otherwise, to the overall marriage, the overall marital estate, and to the raising and care of the partie[s'] children.

With regard to factor #11, the court finds that both of these parties are equally at fault with regard to the overall demise of this marriage, and neither party is substantially more at fault than the other party.

Finally, in regards to factor #12, the court finds that given the court's division of the marital estate, tax consequences, and the other equities between the parties have been adequately and equitably addressed.

23

The court finds that [Wife] is the economically disadvantaged spouse. This is given the fact that [Husband's] past income, as well as what the court expects to be his future income, is far greater than [Wife's] past income, and what the court expects to be [Wife's] future income and her potential to earn future income. The court finds that [Husband] has the ability to pay alimony.

The last issue left for this court to consider regarding alimony is whether or not [Wife] can be sufficiently rehabilitated so as to be able to be free from the current economic disadvantage that she faces.

* * *

The court finds that [Husband's] current income and previous three year[s'] income has ranged, considering his total income package, between $179,000.00 and $199,000.00 per year based upon the testimony and trial exhibits before the court . . . . The court finds that this income level is likely to continue into the immediate future. On the other hand, the court finds that [Wife's] income for the previous three years has averaged the $28,000.00 previously mentioned . . . . The court finds that her income for the immediate future is not likely, based upon the proof currently before the court, to increase substantially. However, the court finds that [Wife] has the ability to earn a reasonable income. Based upon all of the proof and evidence before the court, the court finds that [Husband's] income, for child support and for alimony consideration purposes, shall be $190,000.00 per year, while [Wife's] income shall initially be set at $24,000.00 per year. . . . The court finds that [Wife's] income shall be considered to be $24,000.00 for a period of three years. After the initial three years, then her income will be imputed at $30,000.00, or her actual income if higher, for a period of three years. After that time, her actual income shall be imputed at $36,000.00, or her actual income if higher, for the remainder of time that the parties have a minor child. In the event [Husband] continues to pay school tuition for the children, he shall be given credit on the child support work sheet, and furthermore [Husband] shall be given credit for the insurance premiums that he is paying for the children. While the court has already found that both parties have shown numerous expenses that the court finds to be inflated and/or not credible on their respective income and expense statements, the court finds that [Wife] still has a need, and in the opinion of the court, will continue to have an ongoing need in her monthly finances. Therefore, the court finds that [Wife] shall receive the sum of $2,750.00 per month inclusive of child support for a period of three years.

24

In addition, [Husband] shall be required to pay for [Wife's] current car payment (the Honda Pilot) until it is paid in full. Furthermore, the Care Credit debt shall be the responsibility of [Husband]. After that time, [Wife] shall receive $2,000.00 per month for a period of three years. After that time, [Wife] shall receive $1,750.00 per month for a period of two years. Finally, the court finds that [Wife] shall receive $1,000.00 per month for an additional two years. In the event of death or remarriage of [Wife] prior to the expiration of this 10 year period, then the alimony obligation shall cease.

In weighing the statutory factors, the trial court emphasized the parties' disparate income and earning potential while also emphasizing that both parties possessed the education and training necessary for future productive work lives (factors 1 and 2). *See* Tenn. Code Ann. § 36-5-121(i). The court found Wife's age and mental condition (factor 4), as well as her physical condition (factor 5), to be comparable to Husband's age and condition, although the court noted that Wife had recently weathered some health problems. *See id.* The court further found that both parties would need to make allowances for their equal roles as custodians of the minor children (factor 6), would need to trim their respective standards of living to more nearly meet income (factor 9), had contributed to the marriage in tangible and intangible ways (factor 10), and had stipulated as to fault (factor 11). *See id.* The court also considered the long duration of the marriage (factor 3). *See id.* As to the division of property (factors 7 and 8), the court concluded that because it had "essentially split the equities of the partie[s'] assets equally," the judgment "therefore enabl[ed] both parties to begin their single lives in an essentially equal position as it relates to cash assets." *See id.*

### 1. Transitional Alimony versus Alimony *in Futuro*

Wife argues that although the the trial court properly found that she was the economically disadvantaged spouse, the court contradicted its own findings by awarding transitional alimony rather than alimony *in futuro*. Upon thorough review of the record, we agree with Wife on this issue. As the trial court found in its analysis of statutory factors, Wife was essentially healthy, well educated, and experienced in maintaining a career outside the home. As the trial court also found, however, Wife was definitely the economically disadvantaged spouse with far less potential than Husband for earning income commensurate to the parties' standard of living before the divorce. Although shorter-term alimony is preferable under Tennessee law, alimony *in futuro* may be appropriate when rehabilitation of the economically disadvantaged spouse is not feasible. *See* Tenn. Code Ann. § 36-5-121(d)(4). Tennessee Code Annotated § 36-5-121(f)(1) further provides:

Alimony in futuro, also known as periodic alimony, is a payment of support and maintenance on a long term basis or until death or remarriage of the recipient. Such alimony may be awarded when the court finds that there is relative economic disadvantage and that rehabilitation is not feasible, meaning that the disadvantaged spouse is unable to achieve, with reasonable effort, an earning capacity that will permit the spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties.

In contrast, transitional alimony "is awarded when the court finds that rehabilitation is not necessary, but the economically disadvantaged spouse needs assistance to adjust to the economic consequences of a divorce, legal separation or other proceeding where spousal support may be awarded . . . ." Tenn. Code Ann. § 36-5-121(g)(1). In determining that Wife was in need of transitional alimony rather than longer-term support, the court emphasized Wife's progress already accomplished toward a master's degree in theology. Wife testified that she had earned twenty-five credit hours out of sixty required toward her master's degree. According to Wife, she had typically attended one class a semester from 2008 through 2012. Partners previously had paid Wife's tuition through trade barter. Wife explained that she had suspended her graduate education when Partners terminated her employment due to the cost of tuition. She had paid for one graduate class herself, which she completed in 2013. Wife also testified that in the year before trial, she had completed coursework to become certified as a pharmaceutical sales representative and as an insurance sales representative. She indicated that she had applied for employment positions but had so far been unable to obtain employment.

In addition to emphasizing Wife's education, the court emphasized Wife's "prior work experience" and "excellent past employment resume." Certainly testimony demonstrated that Wife had served successfully in her prior position as a sales manager at Partners, although Wife did not refute Husband's testimony that her title of vice-president had been primarily titular. Husband did acknowledge that he had long given Wife credit publically for helping to found Partners and bring in revenue prior to 2009.[5] It was also

---

[5] Husband authored a book, published in 2008, extolling the story of Partners' formation and success, in which he acknowledged Wife as "an essential part of the heart and soul of this story" and thanked her for "indispensable help in remembering the exciting and challenging events of the past few years, and for [her] insightful reading and critiquing of the story." Bob Lubell with Dean Arnold, FINDING GOD'S FREQUENCY: MY ENCOUNTER WITH THE POWER OF MUSIC, MIRACLES, AND THE FM DIAL, "Acknowledgments" (Klesis Press 2008).

undisputed that Wife had initially created a system for tracking donors and their donations at Partners.

Although we agree that the record supports a finding that Wife possessed valuable work experience, we determine the outlook for Wife's ability to transfer this experience to a future career to be much less sanguine than in the trial court's view. As Wife notes, Partners had been her sole place of employment since it was formed in 1992. Her ability to reference a position at which her ultimate supervisor was her former husband and from which her employment was terminated under difficult personal circumstances would be problematic. Since the termination of her employment by Partners in December 2013 and by Friendship in January 2013, Wife had remained unemployed despite her efforts to obtain additional professional certifications and other employment. She planned to finish her master's degree, but her source of tuition funding had been curtailed when she lost the benefit of Partners' barter with the Church of God's Seminary. In addition, neither party presented evidence regarding any increased earning power a master's degree in theology might afford Wife.

Moreover, even at the peak of Wife's earned gross income in the past, found by the trial court to be approximately $70,000.00 in 2005, she earned only thirty-eight percent of Husband's 2012 gross income of $190,000.00. In 2012, Wife's gross yearly income was only $21,000.00. In contrast, as the trial court found, Husband's earning power is likely to improve given his relationship with the successful nonprofit corporation. Finally, the unusually long duration of transitional alimony awarded in this matter indicates that the trial court recognized Wife's need for alimony beyond a transitional period. *See* Tenn. Code Ann. § 36-5-121(g)(1) (explaining that transitional alimony is a short-term type of spousal support, payable "for a determinate period of time."); *see also Lunn v. Lunn*, No. E2014-00865-COA-R3-CV, 2015 WL 4187344 at *10 (Tenn. Ct. App. June 29, 2015) ("In previous cases where the award of transitional alimony was questioned . . . this Court has affirmed an award of transitional alimony for a period of eight years at most.") (internal citations omitted).

We agree with the trial court's determinations that Wife is in need of alimony and that Husband has the ability to pay alimony. We further determine, however, that due to the widely disparate respective incomes and future earning capabilities of the parties, the trial court's award of transitional alimony should be modified to an award of alimony *in futuro*.

## 2. Alimony *in Solido*

We are further persuaded by Wife's argument that she was entitled to an award of alimony *in solido*. Alimony *in solido*, also known as lump-sum alimony, "is typically

awarded to adjust the distribution of the marital estate and, as such, is generally not modifiable and does not terminate upon death or remarriage." *Mayfield*, 395 S.W.3d at 115. In analyzing the statutory factors, the trial court noted the approximately equal division of the marital estate and found that both parties would therefore be able to "begin their single lives in an essentially equal position as it relates to cash assets." We agree with Wife that this finding was somewhat in contradiction of the trial court's overall conclusion that "[Husband's] past income, as well as what the court expects to be his future income, is far greater than [Wife's] past income, and what the court expects to be [Wife's] future income and her potential to earn future income." At the time of trial, Husband was fifty-eight years old while Wife was fifty-seven years of age. Although their ages were comparable, Husband was the president of a successful nonprofit corporation, earning compensation of $190,000.00, while Wife was not only unemployed but also separated from the career support system of her longtime former employer. Upon a thorough review of the record, we conclude that Wife as the disadvantaged spouse was entitled to a lump-sum award in order to more equitably adjust the distribution of the marital estate. We therefore reverse the trial court's denial of Wife's request for alimony *in solido*.

## B.  Amount of Alimony Award

### 1.  Capped Child Support with Transitional Alimony

As to the amount of alimony, Wife first contends that the trial court erred by combining the award of transitional alimony with child support under one maximum "cap." We agree. As noted above, the trial court in its March 7, 2014 order set the amount of transitional alimony at a maximum amount per month inclusive of child support. Following a subsequent hearing, the trial court in an order entered March 26, 2014, adopted the income shares worksheet presented by Husband, noting that such adoption was over the objection of Wife. Based on the calculations thus adopted, the court ordered Husband to pay $675.00 per month in child support.

We will address the issue Wife has raised regarding the calculation of child support in a subsequent section of this opinion. Here we address the court's decision to combine alimony and child support into one capped amount. Because child support must remain modifiable and cannot therefore be "capped" at a maximum amount, we conclude that the trial court erred in this regard as a matter of law. *See* Tenn. Code Ann. § 36-5-101(g)(1) (Supp. 2015) ("Upon application of either party, the court shall decree an increase or decrease of support when there is found to be a significant variance, as defined in the child support guidelines established by subsection (e), between the guidelines and the amount of support currently ordered . . . ."); Tenn. Comp. R. & Regs. 1240-02-04-.05 (providing for modification of child support orders upon demonstration

28

that a significant variance exists, as calculated under the Income Shares Guidelines, since entry of the original order); *see also Kaplan v. Bugalla*, 188 S.W.3d 632, 636 (Tenn. 2006). Having determined that the award to Wife of transitional alimony should be modified to alimony *in futuro*, we therefore establish the amount of alimony *in futuro* to be awarded separately from the amount of child support.

### 2. Amount of Alimony *in Futuro*

Husband has not disputed the amount of transitional alimony awarded to Wife. The trial court imputed a future income to Wife in the amount of $24,000.00 for a period of three years, to be followed by an imputed income of $30,000.00 for three years, to be followed by an imputed income of $36,000.00 while the parties co-parented a minor child. Considering Wife's education and skills, the evidence does not preponderate against a finding that Wife's income will gradually increase. As Wife notes, however, when the parties' youngest child obtains the age of eighteen years in March 2019, she will be sixty-two years old. It is unlikely that Wife at sixty-two years of age would be able to increase her income beyond the imputed amount of approximately $30,000.00 to an amount in any way approaching the income Husband can be projected to earn in the future.

Upon our careful review, we determine that the amount of $2,075.00 monthly in transitional alimony set by the trial court, when separated from the $675.00 monthly in child support initially included, was within the discretion of the trial court and supported by a preponderance of the evidence presented regarding Wife's need and Husband's ability to pay. As previously determined, we modify the award of transitional alimony to alimony *in futuro*. We conclude that $2,075.00 per month is an appropriate amount of alimony *in futuro* based on the purpose of rendering the standard of living reasonably comparable between the two households. *See* Tenn. Code Ann. § 36-5-121(c)(2).

### 3. Alimony *in Solido* and Disputed Debt

Having previously determined that Wife is entitled to an award of alimony *in solido* in order to more equitably adjust the distribution of the marital estate, we turn now to the amount of alimony *in solido* to be awarded. Within her argument regarding alimony, Wife has raised the question of certain disputed debts that she asserts should have been attributed to Husband. Inasmuch as Wife does not raise the issue of the overall distribution of the marital estate, we address this disputed debt solely within the context of Wife's request for alimony *in solido*.

Concerning alimony *in solido*, Wife requested a lump-sum award of $100,000.00 to be paid in annual installments of $25,000.00 over the course of four years. In support

of her request, Wife asserts that the trial court's judgment left her without resources to pay outstanding debts attributed to her. In particular, Wife argues that she is in need of funds to pay $32,000.00 owed against improved real property awarded to her (what had been the parties' rental property) and credit card debt in the amount of $33,194.00 accrued during the pendency of the divorce, in part to pay living expenses. According to Wife, she also owed an additional debt for attorney's fees, although she acknowledged that a portion of her credit card debt was attributable to pre-trial attorney's fees. Upon our reversal of the trial court's denial of Wife's request for alimony *in solido*, we remand for the trial court to determine the amount of the award based upon the applicable statutory factors and the trial court's previous well-supported findings that Wife is the disadvantaged spouse and that Husband has the ability to pay alimony. *See* Tenn. Code Ann. § 36-5-121(i), *Mayfield*, 395 S.W.3d at 116. On remand, the trial court shall also determine any payment schedule necessary to fulfillment of the alimony *in solido* award.

## VI. Calculation of Extraordinary Educational Expenses in Child Support

Wife also contends that the trial court erred by including $2,250.00 per month in extraordinary educational expenses paid by Father in the calculation of Father's income for child support purposes. The court found that the parties' son, having been diagnosed with a high-functioning form of autism, would continue to need private schooling at the Bachman Academy. Father's testimony and pay stubs demonstrated that Father paid half of the tuition for the oldest child directly and that he provided the other half through trade barter with Bachman Academy. Wife does not dispute the trial court's rationale for finding private schooling appropriate. She solely disputes the manner in which the court calculated the expense on the income shares worksheet because she maintains that the court's method improperly reduced Father's monthly income for child support purposes. Husband argues that if the court erred by including the extraordinary educational expenses as a deduction from Father's income, the error was harmless because the deduction was allowable as a deviation from the basic child support obligation. Upon careful review, we agree with Wife on this issue.

The income shares worksheet adopted by the trial court included a downward adjustment to Husband's gross income for $2,250.00 in private school tuition, entered on the worksheet as "work-related childcare expenses." Tennessee's Child Support Guidelines allow adjustments to a parent's gross income for certain additional expenses. See Tenn. Comp. R. & Regs. 1240-02-04-.04(8). Among those expenses are work-related childcare expenses, defined as follows in pertinent part:

> Childcare expenses necessary for either parent's employment, education, or vocational training that are determined by the tribunal to be appropriate, and that are appropriate to the parents' financial abilities and to the lifestyle

30

of the child if the parents and child were living together, shall be averaged for a monthly amount and entered on the Worksheet in the column of the parent initially paying the expense.

Tenn. Comp. R. & Regs. 1240-02-04-.04(8)(c)1.

In contrast, the Child Support Guidelines provide that a trial court may add extraordinary educational expenses to the base child support amount when the court finds such a deviation to be in the best interest of the child or children. *See* Tenn. Comp. R. & Regs. 1240-02-04-.03(6)(b)5, 1240-02-04-.07(1)(b), (2)(d). In particular, Tennessee Rules and Regulations 1240-02-04.07(2)(d) provides in pertinent part:

d) Extraordinary Expenses.

The Schedule includes average child rearing expenditures for families based upon the parents' monthly combined income and number of children. Extraordinary expenses are in excess of these average amounts and are highly variable among families. For these reasons, extraordinary expenses are considered on a case-by-case basis in the calculation of support and are added to the basic support award as a deviation so that the actual amount of the expense is considered in the calculation of the final child support order for only those families actually incurring the expense. These expenses may be, but are not required to be, divided between the parents according to each parent's PI [percentage of income].

1. Extraordinary Educational Expenses.

(i) Extraordinary educational expenses may be added to the presumptive child support as a deviation. Extraordinary educational expenses include, but are not limited to, <u>tuition, room and board, lab fees, books, fees, and other reasonable and necessary expenses associated with special needs education or private elementary and/or secondary schooling</u> that are appropriate to the parents' financial abilities and to the lifestyle of the child if the parents and child were living together.

(ii) In determining the amount of deviation for extraordinary educational expenses, scholarships, grants, stipends, and other cost-reducing programs received by or on behalf of the child shall be considered.

31

(iii) If a deviation is allowed for extraordinary educational expenses, a monthly average of these expenses shall be based on evidence of prior or anticipated expenses and entered on the Worksheet in the deviation section.

(Emphasis added.) *See also In re Andrea A.R.*, No. M2011-00574-COA-R3-JV, 2012 WL 397475 at *7 (Tenn. Ct. App. Feb. 7, 2012) ("If the court finds private schooling is appropriate, then the trial court is required to calculate the extraordinary education expenses separately and add them to the base child support award.") (citing Tenn. Comp. R. & Regs. 1240-02-04-.07(2)(d)).

As noted previously, "we review child support decisions using the deferential 'abuse of discretion' standard of review," which "requires us to consider (1) whether the decision has a sufficient evidentiary foundation, (2) whether the court correctly identified and properly applied the appropriate legal principles, and (3) whether the decision is within the range of acceptable alternatives." *State ex rel. Vaughn v. Kaatrude*, 21 S.W.3d 244, 248 (Tenn. Ct. App. 2000). We conclude that the trial court erred by inappropriately entering the private school tuition as an adjustment to Husband's gross income rather than as a deviation to be calculated separately and added to the base child support obligation. We therefore vacate the trial court's judgment regarding the amount of child support to be paid by Husband. We remand for recalculation of the income shares worksheet according to the Child Support Guidelines with Husband's payment of private school tuition for the parties' son entered as a deviation added to the base child support award.[6] We emphasize also upon remand that the amount of child support is to be calculated separately from the amount alimony *in futuro* awarded to Wife.

## VI. Conclusion

For the reasons stated above, we vacate the trial court's calculation of Husband's child support obligation. We remand for recalculation of child support according to the Child Support Guidelines with Husband's payment of private school tuition for the parties' son entered as a deviation added to the base child support award. We modify the trial court's award to Wife of transitional alimony to an award of alimony *in futuro* in the amount of $2,075.00 per month, separate from consideration of child support. We

---

[6] Although Husband argues on appeal that with calculation of the private school tuition as a deviation, each party would pay according to his or her percentage of income, such "expenses may be, but are not required to be, divided between the parents according to each parent's PI [percentage of income]." *See* Tenn. Comp. R. & Regs. 1240-02-04.07(2)(d) (emphasis added). Inasmuch as Husband maintained throughout the trial that he would be responsible for the parties' son's tuition and testimony demonstrated that a portion of the tuition was paid through barter as a benefit afforded to Husband by Partners, we find no reason to disturb the trial court's allocation of the responsibility for private school tuition to Husband.

reverse the trial court's denial of Wife's request for alimony *in solido* and remand for the trial court to determine the amount of the award based upon the applicable statutory factors. The court is also to determine any payment schedule necessary. We affirm the trial court's judgment in all other respects, including the dismissal of the third-party appellee, Partners for Christian Media, Inc., from this action. This case is remanded to the trial court for recalculation of Father's child support obligation, determination of the amount of alimony *in solido* to be awarded to Wife, modification and enforcement of the judgment as consistent with this opinion, and collection of costs below. Costs on appeal are taxed one-half to the appellant, Deborah Jo Lubell, and one-half to the appellee, Robert Howard Lubell.

_____
THOMAS R. FRIERSON, II, JUDGE